FOOD SPECIALTIES, INC. *vs.* JOHN C. DOWD, INC.
(and a companion case[1]).

Worcester. Suffolk.   September 21, 1959. — November 13, 1959.

Present: WILKINS, C.J., RONAN, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Contract,* With advertising agency, Performance and breach, Termination. *Conversion. Lien,* Of advertising agency. *Practice, Civil,* Auditor: report of evidence, findings; Case stated. *Evidence,* Of damage, Relevancy and materiality, Presumptions and burden of proof. *Damages,* For breach of contract, For conversion.

Upon objections to the report of an auditor whose findings of fact were to be final, the trial judge correctly struck out certain evidence included therein without an order of court. [742]

An advertising contract between an advertising agency and its client providing that the contract should continue "until terminated by

---

[1] The companion case is John C. Dowd, Inc. *vs.* Food Specialties, Inc.

at least 90 days written notice by either party" was repudiated by a letter sent by the client to the agency at a time when no breach of the contract by the agency existed, stating that the client terminated its appointment of the agency and would place its advertising through the agency for a further period of thirty days only; and the letter, together with the client's subsequent hiring of another concern and failure to place further business through the agency, constituted a material breach of the contract entitling the agency to recover damages for loss of commissions it would have received up to the end of the ninety days following the letter. [743]

A provision of an advertising agreement between an advertising agency and its client that "All material . . . of the client furnished to the agency, or otherwise procured by, or prepared by the agency for the client, shall remain the client's property, subject to his order and use," together with a credit arrangement between the parties whereby the agency's invoices for material prepared were to be paid by the client at the end of the month following, prevented the agency from having any lien for charges not yet due from the client upon materials of the client in the agency's possession prepared by others and furnished to it by the client or prepared by it for the client and already paid for, and the agency converted such materials by unequivocally refusing to surrender them to the client upon demand. [743–746]

The report of an auditor whose findings are final constitutes a case stated, and it is the duty of the trial court and of this court to draw the proper inferences from the auditor's subsidiary findings and to enter the correct judgment. [747]

Where it appeared that the "account supervisor" of an advertising agency handling a client's account suggested to the client's chief executive officer that it "might be a good plan to have some TV commercial shots made" by an actor under contract with the client to indorse its products, that the officer replied "go ahead and make plans for it," that there was further discussion of the project general in terms, and that the commercial was made without anything specific having been asked or said about the cost, a conclusion was proper that the commercial was authorized by the client and that it was liable for the cost thereof, even though it "was the custom in the trade for the customer to be informed" of the estimated cost "before a TV commercial was made." [747]

In an action for breach by wrongful repudiation of a contract whereby the defendant employed the plaintiff as advertising agent, evidence of the plaintiff's commissions from the defendant in a period of the preceding year comparable to the period of the contract remaining after such repudiation was not too remote or too speculative on the issue of the plaintiff's damages for loss of commissions during such remaining period, and the burden was on the defendant to show any reduction in damages attributable to the cost to the plaintiff of earning the lost commissions. [747–748]

Where it appeared in an action against an advertising agency by a client that the defendant refused to deliver to the plaintiff and thereby con-

verted certain advertising material belonging to the plaintiff and by the conversion caused the plaintiff to lose the opportunity to use the remaining value in an existing contract between the plaintiff and an actor for services respecting indorsement of the plaintiff's product, the plaintiff was entitled to recover from the defendant both the value of the material converted and special damages for deprivation of the opportunity of using the remaining value in the contract with the actor. [748]

TORT. Writ in the Superior Court dated September 20, 1956.

CONTRACT. Writ in the Superior Court dated October 29, 1956.

The actions were heard together by *Rome,* J., upon an auditor's report.

*Alfred N. Whiting,* for Food Specialties, Inc.

*Walter Powers, Jr.,* for John C. Dowd, Inc.

CUTTER, J. The first case is an action by Food Specialties, Inc. (Specialties), against an advertising agency, John C. Dowd, Inc. (Dowd), in three counts, alleging conversion of, and damage to, certain advertising material belonging to Specialties. The action by Dowd against Specialties seeks damages for breach of an advertising contract and also to recover a balance alleged to be due under the contract.

The cases were referred to an auditor, whose findings of fact were to be final, and were tried together. Certain modifications in the auditor's report were directed by the trial judge, who ordered judgment for Specialties in the sum of $3,115 with interest, in the case brought by Specialties, and for Dowd in the sum of $12,916.59 with interest in Dowd's action. Specialties and Dowd appealed in the action by Specialties. Specialties appealed in the action by Dowd. The facts are stated as found by the auditor.

On July 15, 1955, Specialties, a manufacturer of pizza pie mix, made with Dowd a contract, the relevant portions of which are: "Dowd . . . is authorized to act for . . . Specialties Inc. in the planning, preparation, purchasing and distribution of its advertising and to perform . . . related services . . . . It is part of the agency's duty [a] to write

and design the advertising, purchase art work . . . etc.
and assemble the advertising campaign for the approval
of the client. . . . [b] to know the qualities of all media . . .
and to buy space or time in such media . . . [and] [c] to
contract for the services of media *when authorized* . . . .
Contracts . . . authorized by the client and executed by
the agency shall be regarded as direct obligations of the
client. . . . *All material property of the client furnished to
the agency, or otherwise procured by, or prepared by the agency
for the client, shall remain the client's property, subject to his
order and use,* or stored by the agency at the client's risk. . . .
This agreement shall continue for . . . one year from July
14, 1955, and thereafter *until terminated by at least 90 days
written notice by either party*" (emphasis supplied). The
agency was to be paid by a "commission of 15% or its
equivalent." In accordance with custom "in the advertis-
ing field when a concern changes from one agency to an-
other," all advertising material developed by Specialties'
two former agencies was forwarded to Dowd. This material
was never used by Dowd.

Friction between Specialties and Dowd soon arose. One
difficulty related to certain television commercial films.
Dowd, in behalf of Specialties, had made a contract for a
period ending May 1, 1956, for the indorsement by one
Colona, an actor, of Specialties' pizza pie mix, including the
use of his picture and certain services in advertising. The
contract was later renewed for a further period ending
April 30, 1957. The earlier contract called for Colona's
presence in New York in August, 1955. Prior to this New
York visit, one Gross, Dowd's "account supervisor" then
handling the Specialties account, suggested to Price, the
chief executive officer of Specialties, whose duty it was "to
supervise the advertising program," that it "might be a
good plan to have some TV commercial shots made by
Colona." Gross explained "that it could be done . . .
cheaper when Colona was in New York," but there "was no
talk about the possible cost." Specialties "had had a com-
mercial made previously" at a "cost of . . . approximately

$1,500." Although Specialties had no plans to "use . . . such a TV strip," Price, "assuming that the cost of it would be comparatively little, . . . told Gross to go ahead and make plans for it." Dowd's representatives arranged with Sound Masters, Inc., to make the commercials at its studios. "This involved a change in the . . . plans which had called for . . . filming . . . the TV commercials at the same . . . place where . . . [certain] still pictures [of Colona] were to be taken." On August 10, one Tully, Dowd's television director, showed the "storyboard," which set out "each action . . . to take place in the commercial," to Price and to two other officers of Specialties, including one Smith, who with Price was "in charge of advertising." Smith and Price were "the ones with whom . . . Dowd . . . had previously dealt." Saleson, the other officer, "had nothing to do with advertising." After minor "changes were made [in the storyboard] Price said it looked all right to him and then he and Smith . . . moved to another part of the room." Gross of the Dowd organization, who was also present, had been informed that the price estimated by Sound Masters, Inc., was $4,500, but "said nothing about this estimated price while Price and Smith were present." The films were made the next day.

In November, 1955, Specialties received an invoice from Dowd for the Colona commercial in the sum of $4,321.80, "the first information Price and Smith received in regard to the cost." Shortly thereafter, Price told Gross that the bill was "extremely large" and that Dowd "had no authority to go ahead with a commercial as expensive as this after informing them that it would be a small cost." On November 18, 1955, at Gross's suggestion, Price wrote to Dowd about his complaints. In his letter, he refused to pay more than $500 for the commercial and enclosed a check for that sum. No further bill was sent by Dowd to Specialties for this invoice until September 10, 1956, after Specialties' termination (mentioned below) of the agency agreement. "[I]t was the custom in the trade for the customer to be informed" of the estimated cost "before a TV commercial

was made." Gross, when he first talked to Price about the commercial, thought its price would be much less, and Price reasonably assumed "from his original conversation with Gross that the cost . . . would be comparatively inexpensive and . . . authorized it on this basis." The auditor concluded on "these facts previously found . . . that the making of the TV commercial was not authorized by . . . Specialties . . . and that it was not liable for the bill," and "that . . . $500 was a reasonable payment for the charge authorized."

In a letter of August 13, 1956, to Dowd, Price referred to matters about which Specialties was dissatisfied (see footnote 2, *infra*) and terminated "our appointment of your agency as our advertising agency." Although asserting that, because of Dowd's alleged failure to perform its duties, "no notice of termination . . . [was] required," Price there stated that Specialties would place its advertising through Dowd for a further thirty day period. The letter contained a demand that the material from Specialties' former advertising agencies in Dowd's possession and all material prepared by Dowd which Specialties had paid for be turned over to Specialties at the end of the thirty day period. On September 13, a further letter notified Dowd that Saleson would call on "September 18 . . . to receive delivery of the . . . property. . . . If you wish to withhold the material developed in your August and September invoices until payment of these invoices that will be satisfactory. At the time of the delivery of our material . . . Saleson will deliver to you our check in the amount of your July invoice." To this the treasurer of Dowd, on September 14, replied, "We do not feel that this material should be released until there is a complete settlement of your obligations to us. At that time we shall deliver all your material which is currently being stored. In connection with the Colona TV spots . . . these items are still . . . on your account . . . unpaid as they were properly authorized and a price quoted to Mr. Saleson by Mr. Gross in the presence of Mr. Tully." On August 7, 1956, an invoice for July

($1,043.72) was sent by Dowd to Specialties and on September 10, 1956, invoices were sent for August ($1,636.43), September ($2,366.31), and the balance claimed on the Colona TV film ($3,821.80). These, in the aggregate, amounted to $8,868.26.

Saleson went to Boston on September 18 and offered Dowd's treasurer a check for the amount of the July invoice. The treasurer said that "they felt they could not give back the materials until all the bills were paid for the whole account." No further demand was made, and no further payment was offered, by Specialties. None of the material was ever delivered to Specialties by Dowd. In September, 1956, Specialties made a contract with Charles Hutchinson, Inc., another advertising agency.

The auditor found that on August 13, when Specialties gave notice of termination of the contract, "there was no existing breach of contract on the part of Dowd," and that Specialties' notice of August 13 followed by its later actions, including hiring the Hutchinson agency, "constituted a breach of contract" by Specialties. He found also that Dowd was entitled to recover for this breach the amount which Dowd would have received in net commissions over the stipulated ninety day period for notice of termination, a total of $3,971.86. This finding was based, in part at least, on evidence that in 1955 such an amount was earned from September 1 to November 13. In addition, the auditor found that Dowd was entitled to the amount of the July, August, and September invoices ($5,046.46) and a small additional item ($76.47). He found for Dowd in its action in the total sum of $9,094.79. He refused Dowd recovery for the balance claimed for the Colona TV film.

With respect to the action brought by Specialties, the auditor found that, although the contract between Specialties and Dowd contained no provision about the time of Specialties' payments of Dowd's invoices, the arrangement early made was that invoices were to be paid at the end of the following month, so that, on September 18 when Saleson called for the materials in Dowd's possession, only the July

invoice was then due and payable. The auditor then considered the provision of the contract that "[a]ll material . . . of the client furnished to the agency, or otherwise procured by, or prepared by, the agency for the client, shall remain the client's property, subject to his order and use." He found (a) that, "[u]nless a ruling of law requires otherwise . . . [Dowd's] duty to perform this obligation . . . was not dependent upon there being no breach of contract" by Specialties when the request was made, and (b) that on September 18 Specialties was entitled to possession of the materials except the Colona TV spots and material covered by the August and September invoices (which in any event had been eliminated from Specialties' demand by Price's letter of September 13). He, accordingly, concluded that Dowd had converted the materials (with the exception just noted) and found Specialties entitled to recover the following items: (a) for material of former agencies, $3,115.15; (b) for Dowd material prepared prior to July 1, 1956, and paid for by Specialties, $6,704.55; (c) for damage through inability to use Colona material (other than the TV spots) between the termination of Specialties' contract with Dowd (November 13) and the expiration of Specialties' contract with Colona (April 30, 1957), $3,600. The auditor thus found for Specialties in the action brought by it in the total sum of $13,419.70.

Upon Specialties' objections to the auditor's report, the trial judge correctly struck out certain summaries of testimony, which were not appropriate parts of the report. See *Lombardi* v. *Bailey*, 336 Mass. 587, 590–591; *Spirito* v. *Capar*, 337 Mass. 431, 432. The judge ruled that the contract provision with respect to Specialties' right to materials "prepared by the agency for the client" is "subject to the right of the agency to assert its statutory or common law liens for such work, labor and material as is furnished or prepared by . . . [the] agency; and that it was not a conversion for the agency to assert such liens by retaining such property until money owed . . . at the time of demand was paid." The recovery by Specialties in its action was ac-

cordingly reduced to $3,113.15, the value of the material of Specialties' old agencies. The judge also reversed the auditor's conclusion that, on the relevant subsidiary facts, the Colona TV commercial was not authorized, and permitted Dowd to recover the balance due for this item, thereby increasing Dowd's recovery in its action to $12,916.59.

1. On August 13, 1956, Specialties in effect repudiated the contract, the repudiation to be effective at the end of a thirty day period. See *Orebaugh* v. *Badger*, 279 Mass. 54, 59–61. The auditor had found that, on August 13, there was no existing breach by Dowd, and this finding was consistent with relevant subsidiary findings.[2] Accordingly, he reasonably concluded that, since "the contract could only be terminated at that time by a ninety day notice," the letter of August 13, when taken together with the later hiring in September of another agency (and consequent failure to place further business through Dowd), constituted a material breach of contract. The letter, as the auditor stated, did not "terminate the contract thirty days thereafter" even if, as the auditor assumed, the notice did operate to terminate the contract after ninety days, and even if it did discharge the duty of further tender or performance of advertising services by Dowd after the thirty day period. *Bucholz* v. *Green Bros. Co.* 272 Mass. 49, 52–53. See *Schilling* v. *Levin,* 328 Mass. 2, 5–6; *Vander Realty Co. Inc.* v. *Gabriel,* 334 Mass. 267, 269; Restatement: Contracts, § 280.

2. Whether a conversion of any of Specialties' property took place depends upon whether Dowd, when it refused to deliver that property to Specialties, had an enforceable lien. The auditor's subsidiary findings show that there was action by Dowd amounting to an unequivocal refusal to surrender the demanded property, for Specialties had given

[2] The auditor found that serious friction had developed. Business had not increased as anticipated. Losses had been sustained. There had been disconcerting shifts in the Dowd representatives handling the account. Markets in the west and south did not respond well to the Dowd advertising campaign. Other complaints had been recorded by Specialties. The auditor could reasonably conclude that these matters in the aggregate did not amount to a material breach of contract by Dowd, so that, at most, they provided the occasion for giving a ninety day termination notice.

ample notice, both on August 13 and on September 13, of its demand, so that Dowd had been afforded reasonable opportunity to decide before September 18 whether it would comply with the demand. Requests in behalf of Dowd on September 18 for further discussion were unreasonable attempts at delay and did not constitute proper conditional refusal of Specialties' demand. See Prosser, Torts (2d ed.) § 15, pp. 74–75.

If Dowd did have a lien, Specialties could not become entitled to the immediate possession of the property without tendering to Dowd the amount secured by the lien. See Restatement: Security, § 78; see also §§ 59–62, 66, 71. Unless Specialties had the right of immediate possession, Dowd's refusal to deliver the property to Specialties was not a conversion. *Gilman* v. *Zirkin*, 265 Mass. 372, 373. See *Massachusetts Lubricant Corp.* v. *Socony-Vacuum Oil Co. Inc.* 305 Mass. 269, 271; Restatement: Torts, §§ 223 (g), 225, 237 (see also Tentative Draft, April 18, 1958, of Restatement 2d: Torts, §§ 222A, 225).

The trial judge obviously concluded that, as to the material prepared by Specialties' earlier advertising agencies, Dowd had no lien either (a) as agent by way of a "particular lien upon property . . . in . . . [its] possession, for charges . . . and expenses . . . connected with the particular property held," see Lummus, Liens, § 116; *Stevens* v. *Robins*, 12 Mass. 179, 181; *Vail* v. *Durant*, 7 Allen, 408, 409; *Arwshan* v. *Meshaka*, 288 Mass. 31, 35; Restatement 2d: Agency, § 464, or (b) by reason of services performed upon chattels to improve them. See *Flesher* v. *Handler*, 303 Mass. 482, 483. See also *Townsend* v. *Newell*, 14 Pick. 332, 335; *Henwood & Nowak, Inc.* v. *Dietz*, 246 Mass. 9, 11; *Murphy* v. *Brilliant Co.* 323 Mass. 526, 529n; *North End Auto Park, Inc.* v. *Petringa Trucking Co. Inc.* 337 Mass. 618, 624. Cf. *De Vinne* v. *Rianhard*, 9 Daly (N. Y.) 406, 410–411; *Jeanette Doll Co. Inc.* v. *Cusmano*, 120 Misc. (N. Y.) 782, 783. Clearly Dowd did nothing, and incurred no expenses, with respect to these advertising materials prepared by others. The judge, however, but not the auditor, ruled that Dowd

could assert a lien on property prepared by Dowd for Specialties "by retaining such property until money owed . . . at the time of demand was paid," perhaps concluding that, under the authorities just cited, Dowd had an agent's lien (and possibly a common law lien for adding value to the materials) upon all property which the parties to the agency contract expected would arise from its performance. See *Morgan* v. *Congdon*, 4 N. Y. 552, 553; *Conrow* v. *Little*, 115 N. Y. 387, 392–393; *Braufman* v. *Hart Publication, Inc.* 234 Minn. 343, 348–350; *Blake* v. *Nicholson*, 3 Maule & Selw. 167, 169; *Chase* v. *Westmore*, 5 Maule & Selw. 180, 183; Annotation, 25 A. L. R. 2d 1037–1040.

We need not decide whether an agent's lien, or a lien for adding value to the materials, or even a vendor's lien, existed apart from (a) the parties' agreement that property "furnished to . . . or . . . procured . . . or prepared by the agency . . . shall remain the client's property, subject to his order and use," taken together with (b) the parties' arrangement that Dowd's invoices were to be paid by Specialties at the end of the month following. The aggregate effect of the contract provision and the arrangement for credit prevented any lien upon the property (whether prepared by Dowd or by others) asserted by Dowd.

Any lien which Dowd might have at common law or by statute, of course, could be modified or waived by contract. Restatement: Security, § 65. Provisions for credit have been held to be inconsistent with a lien, as, for example, where repaired property is to be returned before payment is due. *Wiles Laundering Co.* v. *Hahlo*, 105 N. Y. 234, 240–243. *Matter of Heinsheimer*, 214 N. Y. 361, 366–368. *Stoddard Woolen Mfy.* v. *Huntley*, 8 N. H. 441, 442. *Crawshay* v. *Homfray*, 4 Barn. & Ald. 50, 51–53. *Bock* v. *Gorrissen*, 2 DeG. F. & J. 434, 447–449. Lummus, Liens, §§ 27, 119. See *Chase* v. *Westmore*, 5 Maule & Selw. 180, 186–187. In Restatement 2d: Agency, § 464, comment d, it is said that a "lien does not exist merely because the principal has committed a breach of the contract of employment," a doctrine that is consistent with the cases just cited.

The contract provision by which Dowd was to hold property, subject to Specialties' "order and use," would have had little meaning if Dowd at any time could decline to deliver material and assert a lien for sums not yet due. It was obviously intended that Dowd should comply with Specialties' orders with respect to the property and rely on Specialties' credit, rather than on any lien. A lien upon items already paid for, to coerce payment for other items where Specialties' liability was disputed in good faith, is inconsistent with the contract and credit terms. It may be that, under the cases already cited, no agent's lien, or lien for adding value to the items, could arise later in any event because of the provision for credit. See *Matter of Heinsheimer*, 214 N. Y. 361, 368. This issue we need not decide. Our conclusion is reinforced by the fact that, if Dowd had intended to provide for liens, it could have made appropriate stipulation for them in the agreement. To the extent that Dowd may have been a vendor of chattels to Specialties, the contract provision and the arrangement for credit prevented any vendor's lien during the credit period. In view of the arrangement for monthly invoices, the items improperly withheld we regard as separable from those for which payment was not due at the time of demand. As to the latter group of items, Specialties, by its letter of September 13, 1956, either withdrew or did not press its demand. As to the items covered by the July, 1956, and prior invoices (except the Colona TV invoice), Specialties had either made or offered full payment. Nothing in the record suggests that Specialties was insolvent on September 18, 1956, or at any other time. As to vendors' liens, see Lummus, Liens, § 99; Williston, Sales (Rev. ed.) § 507a; uniform sales act, G. L. c. 106, § 43 (1) (c), prior to the enactment of the Uniform Commercial Code. See also *Arnold* v. *Delano*, 4 Cush. 33, 39; *Jones* v. *Le May-Lieb Corp.* 301 Mass. 133, 134–135. See also the provision of the code found in G. L. c. 106, § 2–703 (a).

3. The auditor based his conclusion that the making of the Colona TV commercial was not authorized by Specialties on the subsidiary facts "previously found." The trial

judge arrived at a different conclusion upon the same facts. The auditor's report constitutes "in effect a case stated, upon which it was the duty of the judge, and is now our duty, to enter the correct judgment." *Wasserman* v. *Roach*, 336 Mass. 564, 567. The trial judge was not bound, and we are not bound, to draw the same inferences and to reach the same conclusions as the auditor upon the subsidiary findings. *United States Fid. & Guar. Co.* v. *English Constr. Co.* 303 Mass. 105, 108–109. *Union Old Lowell Natl. Bank* v. *Paine*, 318 Mass. 313, 315–316.

Despite the auditor's finding that it "was the custom in the trade for the customer to be informed" of the estimated cost "before a TV commercial was made," we reach the same conclusions reached by the trial judge, viz. that the Colona commercial was authorized by Price and that Specialties is liable for the unpaid balance of $3,821.80. The initial discussion of the commercial was general in terms. Neither party was precise. There was, however, no adequate price restriction or condition imposed by Specialties with respect to the authorization. Price failed, on the day before the commercial was made, to ask about the cost. Dowd never withdrew its invoice, although it did not press for its payment, perhaps in the hope that later use of the commercial film would change Price's attitude. Nothing in the subsidiary findings leads us to conclude that the Dowd representatives intentionally or fraudulently withheld from Price information that the price was to be higher than even the Dowd group had originally expected.

4. The evidence of commissions for a comparable period in 1955 was admissible to prove Dowd's loss because Specialties ceased prematurely to place advertising through Dowd. See *Orbach* v. *Paramount Pictures Corp.* 233 Mass. 281, 285; *Galvin* v. *Nutting-Pillman Amusement Co.* 284 Mass. 314, 315; *Rooney* v. *Weeks*, 290 Mass. 18, 30. See also *Nelson Theatre Co.* v. *Nelson*, 216 Mass. 30, 35–36; *Hawkins* v. *Jamrog*, 277 Mass. 540, 543–545. This evidence, especially if taken with evidence referred to in the record (but not reproduced) about the whole volume of advertis-

ing during the contract period, provided a sufficient basis for the auditor's conclusion that the damages arising from Specialties' breach of contract would not be less than the commissions earned in 1955. The evidence was neither too remote nor too speculative. See *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 379–382. Cf. *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 204–205. The burden was on Specialties to show any reduction in damages properly attributable to the probable cost to Dowd of earning the lost commissions. *McNally* v. *Schell*, 293 Mass. 356, 360.

5. The trial judge incorrectly struck from the auditor's report a finding that "the portion of the Colona contract . . . properly attributable to" the period from November 13, 1956 (the date as of which the auditor treated the Dowd contract as terminated, approximately ninety days after the notice of August 13), and April 30, 1957 (when Specialties' contract with Colona for use of his picture and indorsement of the pizza pie mix ended), "was $3,600 and that . . . Specialties . . . is entitled to recover this sum from Dowd," because, in substance, "Specialties . . . was prevented from making use of the Colona advertising . . . prepared by Dowd" during this period. Consequential damages, including loss of use during any period of detention, resulting from and caused by a conversion are recoverable in appropriate cases. *Jackson* v. *Innes*, 231 Mass. 558, 560. *Manhattan Clothing Co. Inc.* v. *Goldberg*, 322 Mass. 472, 476. Restatement: Torts, § 927 (b) and comment l. Harper and James, Torts, § 2.36 at pp. 191–192. McCormick, Damages, 466–467. The auditor allowed Specialties to recover the full value of the property treated by him as converted (which, of course, did not include the TV spots) and also special damages for deprivation of the opportunity of using the remaining value in the Colona contract. Cf. *P. A. Dolan Co.* v. *P. S. Thorsen Co. of Mass.* 324 Mass. 376, 378–379. The somewhat abbreviated findings on this point necessarily imply that the conversion caused each of these separate elements of damage. We cannot go behind these findings. Recovery of the $3,600 item must be allowed.

6. Judgment is to be entered for Specialties in the action against Dowd in the amount of $13,419.70 plus interest from the date of the writ on count 1 and on count 2, which are for the same cause of action. The order for judgment for Dowd on count 3 is affirmed. In the case brought against Specialties the order for judgment for Dowd in the amount of $12,916.59 plus interest from the date of the writ is affirmed.

*So ordered.*