ABINGTON NATIONAL BANK *vs*. ASHWOOD HOMES, INC.,
& another.[1]

Plymouth. October 26, 1984. — March 21, 1985.

Present: PERRETTA, KAPLAN, & WARNER, JJ.

*Practice, Civil,* Instructions to jury. *Conversion. Damages,* Conversion.

In an action by a bank alleging that the defendant, who had been a landlord of
    the bank's debtor, had converted collateral in its possession the evidence
    and the inferences permissible therefrom were sufficient to withstand
    the defendant's motions for a directed verdict and for judgment not-
    withstanding the verdict. [506-507]
A judge's erroneous instructions to the jury necessitated reversal of a judg-
    ment for the plaintiff in an action for conversion, where the judge
    repeatedly and inaccurately characterized two actions of the defendant
    as "wrongful" and where his instructions were misleading as to the
    significance of these actions. [507-509]
In the determination of damages recoverable by a bank against a former land-
    lord of the bank's debtor for conversion of collateral of which the bank
    had the right to take possession, the landlord was not entitled to have
    any loss of rent offset from the fair market value of the collateral at the
    time of the conversion. [509-510]

CIVIL ACTION commenced in the Superior Court Department
on October 11, 1978.

The case was heard by *George P. Ponte,* J.

*Henry A. Goodman* for the defendants.

*Michael C. Gilleran (Thomas R. Mullen* with him) for the
plaintiff.

PERRETTA, J. By reason of a promissory note and security
agreement, the plaintiff, Abington National Bank (bank), had
an interest in the equipment and inventory of the Farmers
Butcher Shop, Inc. of Brockton (Farmers), which conducted

---

[1] Joseph R. Spadea, president of Ashwood Homes, Inc., at all times
relevant to the dispute.

its business on premises leased from the defendants (collectively referred to as Ashwood). Farmers' business faltered, and it became in default of its obligations to the bank under the terms of the promissory note as well as to Ashwood under the rent provisions of the lease. After Farmers ceased doing business, a dispute arose between the bank and Ashwood concerning removal of Farmers' equipment from Ashwood's premises. The bank brought an action against Ashwood for conversion, claiming that Ashwood refused to allow the bank to take possession of its collateral, and Ashwood counterclaimed that the bank had refused to remove Farmers' equipment. Ashwood sought reimbursement for loss of rent and expenses incurred in removing and storing the bank's collateral. The jury found for the bank, but, because of confusing and erroneous jury instructions, we reverse.

1. *The Facts.*

We recite the facts as they appear from the selected exhibits and portions of testimony reproduced in the record appendix. Farmers closed its doors to the public on December 31, 1976, except for a three-day period for a closeout sale the following month. The equipment and inventory were not thereafter removed from the premises by Farmers because its president believed that there would be an auction sale by the bank of its collateral in accordance with the terms of the security agreement.[2]

When Farmers failed to pay its rent to Ashwood, Ashwood's rights under the lease (par. 19) were as follows: "[T]he Lessor shall have the right to re-enter the demised premises, repossess said premises, evict the Lessee . . . remove the property of the Lessee . . . and in the discretion of the Lessor relet the demised premises." Ashwood changed the locks to the premises on or about April 21, 1977. Anything which may have tran-

---

[2] Paragraph seven of the security agreement reads in relevant part: "Secured Party may require Borrower to assemble the inventory and equipment and make them available to Secured Party at a place to be designated by Secured Party. . . . Secured Party will give Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other intended disposition thereof is to be made." See generally G. L. c. 106, §§ 9-503 and 9-504.

spired between Farmers and the bank after the closeout sale in January is not revealed on the record before us.

Notwithstanding the change of locks, Ashwood allowed the bank's auctioneer on the premises, some time in the spring of 1977, to appraise the bank's collateral. The bank, however, throughout the spring and summer of that year, made no move to take possession of the equipment which had remained on Ashwood's premises.

In September, Ashwood wanted to ready its property for smaller stores that had indicated a desire to occupy the premises. On September 16, 1977, Ashwood's attorney wrote to the bank's attorney, giving notice that the bank was to remove the equipment and that should it fail to do so, Ashwood would remove and store the equipment at the bank's expense. The final sentence of the letter reads: "In order to remove said equipment my client has requested a $5,000.00 cash bond be placed in escrow in order to guarantee compensation for any damages caused by the removal of said equipment."

When neither the bank nor its attorney responded to that letter, Ashwood's attorney, on October 19, 1977, wrote directly to the bank, explaining that renovations of the premises had to be completed so that the property could be rented.[3] Ashwood's attorney stated that Ashwood could wait no longer "[d]ue to loss of rent," and "[t]herefore, all equipment and material will be sold in order to pay for the removal and storage of same."

To this letter the bank responded within eight days, writing that "an immediate action" for conversion would be brought against Ashwood if it were to sell any of the bank's collateral. Some six weeks later, the bank sent a second letter to Ashwood's attorney, advising that Ashwood "certainly" had no claims against the bank and demanding that all of its collateral "be delivered up to . . . the auctioneer who will sell it at public auction." Action against Ashwood would be brought

---

[3] Meanwhile, some time in September, Ashwood began to remove some of the equipment to three other properties owned by it so that renovations for new tenants could be made.

unless the bank should receive "assurances," within five days, "that the equipment in question will be released to the auctioneer."

It does not appear in the record appendix whether Ashwood in fact gave the demanded "assurances." What is certain, however, is that on January 9, 1978, Ashwood's attorney again wrote to the bank's attorney, asking permission to sell the bank's collateral in Ashwood's possession and place any sale proceeds in escrow "pending the outcome of this matter." We have no information before us which reveals what, if anything, happened between Ashwood and the bank from the time of the January letter until the bank brought the present action on October 11, 1978.

2. *Motions Under Mass.R.Civ.P. 50(a) and (b).*

Ashwood's requests for directed verdicts and judgments notwithstanding the verdicts, Mass.R.Civ.P. 50(a) and (b), 365 Mass. 814-815 (1974), relate only to the bank's action for conversion and were based upon two grounds.

a. *Evidence of an outstanding debt.* The bank holds the promissory note and security agreement, under which it claims a right to possession, by way of an assignment which came about in the following manner. Farmers borrowed money from the Farmers Butcher Shop, Inc., of Abington (Farmers of Abington) and in so doing executed the promissory note and security agreement in question. Farmers of Abington had obtained the money from the bank, assigning to it the note and agreement as security for the debt.

Ashwood argues that to prevail in its action for conversion, the bank was required, but failed, to prove that Farmers' debt to Farmers of Abington was still outstanding. Ashwood cites no authority for this proposition, but we need go further than to say that even were Ashwood correct on the law, the bank's supplemental appendix reveals testimony sufficient to overcome Ashwood's claim.

b. *Evidence of demand and refusal.* Relying upon *Atlantic Fin. Corp.* v. *Galvam*, 311 Mass. 49, 50-51 (1942), wherein it is stated, "A demand is a necessary preliminary to an action for conversion where the defendant's possession is not wrongful

in its inception and demand and refusal are required to put him in the position of a wrongdoer," Ashwood contends that there is no evidence to show that the bank demanded possession of its collateral and that Ashwood refused to surrender it.

Although we are tempted to agree with Ashwood that there has been no showing that Ashwood refused to accede to a demand by the bank, we nonetheless conclude that, upon proper instructions, a jury could have inferred from the correspondence between the bank and Ashwood that the requisite demand and refusal had been made.

3. *The Jury Instructions.*

The judge began his instructions on conversion with a correct definition of that tort: "One who intentionally or wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time is liable for the tort of conversion." See generally Nolan, Tort Law § 35 (1979). From the elements of conversion follows the basic question that was to be determined by the jury: What, if anything, did Ashwood do to prevent the bank from taking possession of its collateral?

In answering this question, the jury's attention properly could be directed, as it was, to two acts by Ashwood: (1) the changing of the locks, and (2) the request for a $5,000.00 cash bond. On the issue of the locks, the jury should have been instructed, in some appropriate language, that the act of changing the locks does not, in and of itself, constitute a conversion, and that they must consider whether that act, considered with all the evidence, prevented the bank from removing its collateral. See *Edinburg* v. *Allen-Squire Co.*, 299 Mass. 206, 212 (1938). Instead, the jury heard the judge characterize that act as "wrongful" in terms which seem to us not only inaccurate but also lacking in clarity.

The "request" for the cash bond, made in Ashwood's letter of September 16, 1977, was cast in the same light. The trial judge not only referred to the "request" as a "demand," he instructed the jury that it was a "wrongful demand," for the

following reason. Applying G. L. c. 106, § 9-313(8),[4] the trial judge instructed the jury that Ashwood could have requested a bond "to reimburse for the cost of repair of any physical injury" to the real estate caused by removal of the equipment; it could not, however, seek any reimbursement for "diminution in value of the real estate." Because the request for the bond was "for *any* damages" (emphasis supplied), it was too broad and was, therefore, "a wrongful demand." At no time was the jury instructed to consider whether Ashwood's request was unreasonable or whether the bank was denied the right to remove its collateral because it refused or failed to comply with Ashwood's request.

A reading of the charge as a whole reveals that these statements were not mere lapses in otherwise fair and correct instructions on the law to be applied to the facts as found. Indeed, contrary to the mandate of G. L. c. 231, § 81 ("The courts shall not charge juries with respect to matters of fact, but they may state the testimony and the law"), the statements were made repeatedly. It is difficult to imagine how the jury could assess fairly Ashwood's side of the matter after hearing: "So, if you find . . . that the Bank under its security agreement was entitled because of default to take possession of the personal property in the security agreement but Ashwood or Spadea or both changed the locks and then made the wrongful demand for a cash bond of $5,000, such conduct is an act of dominion or control, it's a violation of the right to possession of those goods which the bank had under its security agreement, and

---

[4] Section 9-313(8), as appearing in St. 1979, c. 512, § 7, reads: "When the secured party has priority over all owners and encumbrances of the real estate, he may, on default, subject to the provisions of Part 5, remove his collateral from the real estate but he must reimburse any encumbrancer or owner of the real estate who is not the debtor and who has not otherwise agreed *for the cost of repair of any physical injury, but not for any diminution in value of the real estate caused by the absence of the goods removed* or by any necessity of replacing them. A person entitled to reimbursement may refuse permission to remove until the secured party gives adequate security for the performance of this obligation." (Emphasis supplied.)

such wrongful conduct is conversion."[5] We see nothing in the subsequent statement set out in note 5, *supra*, or the trial judge's "supplemental" instruction after Ashwood's objection[6] which can be deemed to have cured the error. The judgments[7] must be reversed. See *Houle* v. *Lewonis*, 245 Mass. 254, 257-258 (1923); *Posner* v. *Minsky*, 353 Mass. 656, 658-660 (1968); *Wilson* v. *Boston Redevelopment Authy.*, 366 Mass. 588, 591-592 (1975).

4. *Other Issues.*

There remain two issues which may recur at any retrial on the complaint and counterclaim. Only brief discussion is required.

a. *Damages.* Ashwood argues that on the bank's claim for conversion, the trial judge erroneously refused to instruct the jury that Ashwood was entitled to an offset for loss of rent and any "monies in excess of the balance due the Bank on the loan." If Ashwood is found liable in conversion, it is not entitled to have any loss of rent offset from the fair market value of the goods at the time of the conversion. See *Food Specialties, Inc.* v. *John C. Dowd, Inc.*, 339 Mass. 735, 743-745 (1959). Additionally, the jury were instructed that, if they found for Ashwood on the bank's complaint, they then were

---

[5] Another example: "[I]f you find that there had been no conversion by any conduct of the lessors either by changing the locks or making it wrongfully, making a wrongful demand for a $5,000 cash bond, if you find there was none of that and you find that the lessors demanded of the bank 'move it' and the bank did not do it, then there would be no conversion." The jury could reasonably have interpreted this statement to mean that if they were to find that a request for a cash bond had never been made, then there would be no conversion; if the request had been made, it was a wrongful demand, and, hence, a conversion.

[6] "I want to make an *addition* to my instructions that I have already given to you. In my instructions in chief I referred to the evidence concerning the changing of the locks as well as the demand for a cash bond of $5,000. I want to just *add* the following to what I said previously, that if you find . . . that the defendants did not interfere with the Bank's right to possession, then the acts of changing the locks or demanding of a cash bond are not such acts as to amount to conversion." (Emphasis supplied.)

[7] As the jury were instructed that if they found in favor of the bank on its claim for conversion, they must also find for the bank on Ashwood's counterclaim, that judgment also must be reversed.

to take up Ashwood's counterclaim, which sought damages for loss of rent. As to any monies in excess of the amount of the balance due the bank from Farmers, Ashwood argues only that as an assignee, the bank is in no better position than Farmers or Farmers of Abington. This is not an action on the note; the bank seeks damages in its own right for the conversion of property to which it claims a right of possession.

b. *Photographs.* Ashwood attempted to put in evidence certain photographs that it had taken of its premises after it removed Farmers' equipment. Ashwood claims that the photographs are relevant to issues of: (1) whether certain items of the collateral had become fixtures; (2) the amount of damage to the real estate caused by the removal of the equipment; and (3) the reasonableness of the request for a cash bond. The relevance, and hence, admissibility of the photographs at any retrial is a matter we leave initially to the trial judge.

*Judgments reversed.*