## Woburn Country Club, Inc. *vs.* Woburn Golf & Ski Authority.

Middlesex.   November 20, 1984. — December 19, 1985.

Present: Armstrong, Cutter, & Dreben, JJ.

*Practice, Civil,* New trial. *Damages,* Remittitur. *Conversion. Bailment.*

Under Mass.R.Civ.P. 59(d), where a party to a civil action had filed a timely motion for a new trial, the judge, acting approximately one year after judgment entered, had the power to allow the motion on grounds other than those that the moving party had stated with specificity. [261-264]

A lessee, the operator of a country club, was not entitled to recover from its former lessor the rental value of certain clubhouse furnishings and groundskeeping equipment which it left on the demised premises after termination of its lease where, on the facts as found by a master, the lessor's obligations were those of a gratuitous bailee of the goods and no basis existed for finding either an express or implied agreement to pay a rental for their use. [264-267]

A claim by a lessee, the operator of a country club, with respect to certain clubhouse furnishings and groundskeeping equipment which it had left on the premises of the defendant, its former lessor, was properly submitted to the jury on the theory of conversion, with damages, if appropriate, to be assessed at the fair market value of the goods on the date of the conversion, plus interest. [267]

Contract. Writ in the Superior Court dated February 19, 1974.

The case was tried before *Philip J. Murphy,* J., sitting under statutory authority, and a motion for a new trial was allowed by him. The case was retried before *Alan J. Dimond,* J.

*Alexander E. Finger (John J. Fitzpatrick* with him) for the plaintiff.

*John Arthur Johnson* for the defendant.

Armstrong, J.   When the city of Woburn and the then newly created Woburn Golf and Ski Authority (authority) succeeded in obtaining a judgment invalidating the three-year lease of the

city's golf course and ski area to the Woburn Country Club, Inc. (club), the club was unable to obtain a stay of the judgment pending appeal and was forced to vacate the premises on May 9, 1973. The authority was left with a claim against the club for fees collected by the club in 1973 for memberships which the authority, under an order of a single justice of this court, was required to honor[1]; and the club was left with a claim against the authority for personal property left on the premises, ranging from clubhouse furnishings to groundskeeping equipment, which the authority neither returned nor purchased.

Each filed suit, and the two cases were referred to a master who found for the authority in the membership fees case in the amount of $7,180, and for the club, in the left-behind furnishings and equipment case, for either $450 per month from May, 1974, if the club should be permitted to recover on the basis of fair rental value, or $8,550, if the club should be limited to recovery of the fair market value of the property in dispute. The cases were then tried to a jury, who were instructed that the club could recover for the fair rental value of the furnishings and equipment from May 10, 1973, to the date they were converted by the authority, and for their fair market value on that date. In response to special questions, the jury assessed damages in the club's favor of $200,372.95 for fair rental value and $20,000 for fair market value on the date of conversion. (In the membership fees case the jury awarded the authority $7,180.)

Judgments were entered accordingly, but thereafter, in the furnishings and equipment case, the authority filed a timely

---

[1] The single justice denied the stay sought by the club on the stipulation of the authority that it would honor memberships granted by the club for 1973 as well as impending social commitments, such as wedding receptions and retirement parties. The order provided that, if the judgment invalidating the lease should be reversed on appeal, the authority should account to the club for all funds received by the authority from the date of its possession, less an amount determined to be the reasonable expenses of operation and maintenance of the property up to the date of repossession (or the end of the lease, should that come earlier). The judgment was affirmed, however, in *Woburn Golf & Ski Authy.* v. *Woburn Country Club, Inc.*, 365 Mass. 415 (1974).

motion under Mass.R.Civ.P. 59, 365 Mass. 827 (1974), for a new trial for the reasons that "[t]he special jury verdict as returned is against the law [, . . .] against the evidence [, . . .] against the weight of the evidence [, . . . and] excessive as a matter of law." After the hearing (a year later), the trial judge allowed the motion, adding that "[i]t is obvious from the verdict itself that it was based on a misunderstanding of the law and the instructions and was not merely excessive. For this reason an order for remittitur is not proper."

In October, 1981, the matter came on before a different judge, who ruled that the facts found in the master's report furnished no basis for a recovery of the fair rental value of the furnishings and equipment and accordingly allowed the authority's motion to strike the portions of the report computing recovery for the club on that basis.[2] The case was then tried to a jury on a theory of conversion, and the jury returned a verdict for the club for $10,700.

The case is before us on the club's appeal. Its principal contention is that the first judge's order allowing the authority's motion for a new trial was in error for a procedural reason. Observing that the reasons stated in the motion lacked specificity, the club cites a number of Federal cases standing for the proposition that the reasons for a new trial motion under Fed.R.Civ.P. 59(a) must be stated with specificity (see Fed.R.Civ.P. 7[b]); that if the reason given by the judge for allowing the motion is not one raised with requisite specificity in the motion, the judge's order must be treated as one entered sua sponte under rule 59(d); and that such an order, to be valid, must be entered, by the terms of rule 59(d), within ten days

---

[2] He also ruled that the order allowing the motion for a new trial applied only to the club's case (for furnishings and equipment) and allowed the authority's motion for execution to issue in its own case (to recover membership fees paid to the club) on the $7,180 (plus interest) judgment. The docket entries show that the motion for a new trial had not been filed in the latter case. Even if that omission were shown to be the product of clerical error and were corrected, however, it was open to the second judge to modify the interlocutory order of the first judge allowing the new-trial motion. See *Genesco, Inc.* v. *Koufman,* 11 Mass. App. Ct. 986, 990 (1981), and cases cited.

after judgment. Federal Rule of Civil Procedure 6(b), like its Massachusetts counterpart, forbids extensions of the ten-day period. Here, of course, the order for a new trial was entered more than a year after judgment.

The cases cited by the club[3] were mostly decided prior to 1966. In that year, in order to meet the very problem raised by the club (see Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure [II], 81 Harv. L. Rev. 591, 598-604 [1968]), rule 59(d) was amended by inserting the following sentence: "After giving the parties notice and an opportunity to be heard on the matter, the court may grant a motion for a new trial, timely served, for a reason not stated in the motion." See 6A Moore's Federal Practice par. 59.01[7], at 59-8 (2d ed. 1985). At least where the judge grants the motion, therefore, the amendment substantially ends "the previous controversy about how specifically grounds must be set forth in a new trial motion. Since the court may act on a ground not stated, it may also act on ground imperfectly stated." 11 Wright & Miller, Federal Practice and Procedure § 2813, at 90 (1973). Where, as here, a party files a timely motion for a new trial, the "court has the power to grant a new trial, on its own initiative, more than [ten] days after the entry of judgment for any reason for which it might have granted a new trial on motion of a party." 6A Moore's Federal Practice par. 59.11, at 59-269 (2d ed. 1985). *Lapiczak v. Zaist,* 451 F.2d 79 (2d Cir. 1971), the only post-1966 case cited by the club, is inapposite because the plaintiffs there did not file their motion for a new trial within ten days after the entry of judgment. Massachusetts Rule of Civil Procedure 59(d), 365 Mass. 828 (1974), follows the post-1966 text of the corresponding Federal rule and thus includes the added sentence.

---

[3] *Marshall's U.S. Auto Supply* v. *Cashman,* 111 F.2d 140, (10th Cir.), cert. denied, 311 U.S. 667 (1940). *Freid* v. *McGrath,* 133 F.2d 350, 355 (D.C. Cir. 1942). *Kanatser* v. *Chrysler Corp.,* 199 F.2d 610, 615, 616 (10th Cir. 1952), cert. denied, 344 U.S. 921 (1953). *National Farmers Union Auto & Cas. Co.* v. *Wood,* 207 F.2d 659, 660-662 (10th Cir. 1953). *Chicago & No. W. Ry.* v. *Britten,* 301 F.2d 400, 401 (8th Cir. 1962).

It is doubtful that the club could prevail on this point even apart from the 1966 amendment. The first three grounds stated in the authority's motion lacked the specificity required by Mass.R.Civ.P. 7(b), 365 Mass. 749, but the same was not true of the fourth ground: namely, that the verdict was excessive. Such was the holding of *United States* v. *64.88 Acres of Land*, 25 F.R.D. 88, 89 (W.D. Pa. 1960), a case cited properly by the club for the proposition that the other grounds relied on in the motion were inadequately specific. See also *Fried* v. *McGrath*, 133 F.2d 350, 354-355 (D.C. Cir. 1942); *Young* v. *International Paper Co.*, 322 F.2d 820, 822 (4th Cir. 1963). Compare *Nicklas* v. *New Bedford*, 250 Mass. 471, 473 (1925), decided under G. L. c. 231, § 127, as then in effect, which, like our present rules, required a motion for a new trial to state "the reasons relied upon in its support."[4] The judge allowed the motion only in part on the ground of excessiveness of verdict, that being implicit in his written explanation of his reasons for not making his order conditional on a refusal of remittitur as is otherwise required by rule 59(a), 365 Mass. 827 (1974).[5] If the judge was bound to afford notice and hearing

---

[4] The portion of Mass.R.Civ.P. 59(a) relating to motions for a new trial based on inadequacy or excessiveness of verdict derives from G. L. c. 231, § 127, as in effect prior to St. 1975, c. 377, § 109, rather than from Fed. R.Civ.P. 59(a). *D'Annolfo* v. *Stoneham Housing Authy.*, 375 Mass. 650, 661 (1978).

[5] The rule states, in part: "A new trial shall not be granted *solely* on the ground that the damages are excessive until the prevailing party has first been given an opportunity to remit so much thereof as the court adjudges is excessive" (emphasis added). In the circumstances of this case the judge was justified in drawing the inference that the verdict was so excessive as to indicate the jury's total misunderstanding of his instructions. Compare, in this regard, *Freeman* v. *Wood*, 379 Mass. 777, 785-786 (1980), stating that additur is an appropriate remedy when "the verdict is sound except for inadequacy of the amount and the inadequacy is such as to descend to the level of unreasonableness. An unduly slim verdict, however, may signal the existence of other defects of the work of the jury, or mistakes by the judge. In such a case additur would not be appropriate, and a simple new trial would be called for." The first judge had instructed the jury that they could compute fair rental value ("use value") up to the date of conversion, and that conversion had occurred when the authority prevented the club from removing its goods from the premises. That instruction, in light of

under rule 59(d) because his reason for granting the motion went beyond mere excessiveness of verdict, no showing has been made that he did not do so. The record shows that the judge afforded a hearing, and gave the parties a week after the hearing to file memoranda. The record is otherwise silent as to what may have transpired at the hearing.

The second judge did not err in striking the portions of the master's report that would have awarded damages for the fair rental value of the club's personal property. The pertinent facts found by the master were to the effect that, when the city recovered the real estate, the authority and the club agreed that the club would leave its personal property on the premises, contemplating at that time that the authority would purchase the property at an appraised value; that, from the outset, the authority used the property; that difficulties arose thereafter in consummating a sale (some property was repossessed by creditors; some was determined to be affixed to the real estate; differences arose as to which items belonged to the club; and the appraisals apparently differed widely); that on October 17, 1973, the authority notified the club that it had decided not to purchase "the personal property that is said to be the property of the [club] and which still remains on the premises of the [a]uthority"; that on November 5, 1973, the club asserted for the first time a claim to be paid for the fair rental value of the property, for the previous five months; that thereafter, up to April, 1974, the club took or received back personal property worth at least $9,000; and that after April, 1974, there remained on the premises of the authority property belonging to the club with a fair market value of $8,550. The master found the fair

the evidence at the first trial most favorable to the club, would have permitted computation of rental value for a period of approximately eleven months. The highest evidence of rental value (that claimed and billed by the club) would have totaled $48,745.60 over that period. (The master would have computed rental value over the same period at $4,950.) The judge could properly conclude that the jury's computation of $200,372.95 was inexplicable, particularly in light of their finding that the value of the goods when converted (some two thirds of the total value at the start of the rental period) was only $20,000.

rental value of the property to be $450 per month and assessed damages at that rate from May, 1974, on the assumption there had been no conversion. (The master expressly denied recovery of fair rental value from May, 1973, the month of the authority's take-over, through April, 1974, the last month in which the club removed property from the premises.) There was no finding to the effect that the authority had at any time denied the right of the club to take the remaining property back (contrast *Brown* v. *General Trading Co.*, 310 Mass. 263, 268 [1941]); or that the authority had at any time agreed to pay rental value for the use of the property; or that the club had demanded at any time that the authority cease its use of the property.[6]

On the master's findings the authority was a gratuitous[7] bailee of goods for use (as opposed to storage) for an indefinite term, and, as such, had an obligation to confine its use of the goods to that contemplated at the creation of the bailment, to exercise care with respect to the goods, and to return them to the club, or make them available for the club to pick up, at

---

[6] There was a finding, labeled subsidiary but in nature probably general, which stated that "all personalty left on the premises after May 10, 1973, was used by the [a]uthority or made available to it for its use with the expectation and understanding that the [c]lub expected to be paid for its use." In the context of the report as a whole this ambiguous sentence must be read as a reflection of the fact that the club had been asserting a right to recover rental payments from November, 1973, and the authority was using the property at all times thereafter knowing that the club was asserting such a claim. The sentence cannot fairly be read as a finding that the authority ever agreed, explicitly or implicitly, to make such payments.

[7] The bailment can be thought of as gratuitous because no consideration bound the bailor (the club) to leave the goods with the bailee (the authority) until the purpose of the bailment was accomplished. See 9 Williston, Contracts § 1039, at 908 (3d ed. 1967). Alternatively, the bailment could be categorized as one for the mutual benefit of the parties (9 Williston at § 1040) because of the contemplated sale, an arrangement analogous to a vendor's putting goods out on approval. Compare *Newhall* v. *Paige*, 10 Gray 366, 368 (1858). Nothing turns on the distinction in this case. Generally, the distinction is made to determine the scope of the bailee's duty of care, which many authorities indicate is greater where the bailment is for his sole benefit. See, e.g., Story, Bailment § 237 (9th ed. 1878); 2 Kent's Commentaries (3d ed. 1836) 574; *Carpenter* v. *Branch*, 13 Vt. 161, 164 (1841).

such time as the club should demand their return.[8] Story, Bailment §§ 231, 236 (9th ed. 1878). Edwards, Bailments §§ 129, 170 (2d ed. 1878). 9 Williston, Contracts § 1039, at 907-908 (3d ed. 1967).

At any time the club could have terminated the bailment unilaterally by demanding return of the goods (see Restatement [Second] of Torts § 254 illustration 2, [1965], and § 892A [5] [1977]); but a change in the terms of the bailment must rest on an agreement of the parties. 9 Williston, Contracts § 1030, at 876-880 (3d ed. 1967). Compare *Keith* v. *DeBussigney*, 179 Mass. 255, 259 (1901). There was, on the master's findings, no agreement which created a duty on the part of the authority to pay a rental for the use of the goods. An agreement to pay rent may not be implied from the authority's continued use of the club's goods after it became aware of the club's unilateral assertion of a right to be paid fair rental value.

The club's demand for rent was not the equivalent of a demand for return of the goods. Compare *Fairbank* v. *Phelps*, 22 Pick. 535, 539-540 (1839). An ineffective demand does not terminate a bailee's right to use the goods. See *Mueller* v. *Technical Devices Corp.*, 8 N.J. 201, 212 (1951). If we assume the opposite, the result would not be an obligation to pay rent. Rather, the authority's continued use of the property while denying an obligation to pay rent would, in effect, constitute a conversion of the property. That, under the well-established rule, would entitle the club to recover the fair market value of the goods at the time of the conversion, with interest to the date of judgment. *Lawyers Mtg. Inv. Corp.* v. *Paramount Laundries, Inc.*, 287 Mass. 357, 361 (1934). The cases which state that the bailor may recover "the value of the use of which the [bailor] has been deprived during the period of wrongful detention," *ibid.*, presume a conversion, followed either by a return of the converted goods, accepted by the bailor, or actual

---

[8] Unless the terms of the bailment expressly or impliedly (as by custom and usage) require the bailee to redeliver the bailed goods, "[t]he [bailee] ordinarily is not required to do more than permit the [bailor] to come and get the chattel." Restatement (Second) of Torts § 237 comment *g*, at 465 (1965).

loss suffered by the bailor (or expense reasonably and necessarily incurred) beyond the loss of the goods converted. McCormick, Damages 466-468 (1935). See e.g., *Jackson* v. *Innes*, 231 Mass. 558, 560 (1919); *Manhattan Clothing Co.* v. *Goldberg*, 322 Mass. 472, 476 (1948); *Food Specialties, Inc.* v. *John C. Dowd, Inc.*, 339 Mass. 735, 748 (1959); *George* v. *Coolidge Bank & Trust Co.*, 360 Mass. 635, 641 (1971). None of these was found by the master here.

At the second trial, the judge submitted the case to the jury on instructions which enabled them to find a conversion, which they did, and had them assess damages on the basis of the fair market value of the goods at the date of the conversion, plus interest. The club points to no evidence adduced at the second trial which took the case outside the operation of the principles already discussed. Thus, there was no error shown in the judge's refusal to instruct the jury in respect of fair rental value.

*Judgment affirmed.*