GRAND PACIFIC FINANCE CORPORATION vs. DAVID P. BRAUER & others.[1]

No. 00-P-1075.

Norfolk. May 14, 2002. - February 21, 2003.

Present: DUFFLY, KANTROWITZ, & BERRY, JJ.

*Conversion. Escrow. Corporation,* Professional corporation, Officers and agents. *Fraud. Consumer Protection Act,* Availability of remedy, Trade or commerce, Unfair or deceptive act. *Fiduciary.*

At the trial of an action brought by a corporation against a law firm for conversion of certain corporate funds held by the law firm as escrow agent, the judge's determinations that there was a breach of the terms of the escrow agreement and a conversion of the corporation's funds, and that both the law firm and a named partner individually were liable for the conversion, were correct as a matter of law and supported by the evidence [412-414]; further, the judge was correct in determining that the elements of conversion were not established as to a third party that had no obligation to honor the escrow agreement [414-415].

At the trial of an action brought by a corporation against a law firm and a named partner (defendants) for fraud in connection with the misappropriation of certain corporate funds held by the law firm as escrow agent, the record supported the judge's dismissal of the fraud count, where there was no evidence that the defendants had made fraudulent representations at the time that the corporation had initially advanced the funds, or that the corporation had detrimentally relied on any misrepresentations in advancing the funds. [415]

At the trial of an action brought by a corporation against a law firm and a named partner (defendants) for violations of G. L. c. 93A in connection with the misappropriation of certain corporate funds held by the law firm as escrow agent in a loan transaction, the judge incorrectly determined that the defendants were not subject to liability under G. L. c. 93A, where the transactions between the parties were commercial in nature, and where the defendants were acting in a business context [415-419]; further, the deceptive acts and practices of a second named partner, which resulted in a portion of the misappropriated funds being used to pay consulting fees owed to a third defendant (a corporation of which he was the sole shareholder, officer, and director), were attributable to the third defendant and supported the imposition of liability against it under G. L. c. 93A [419-420].

This court remanded a matter to the Superior Court for a determination of ap-

---

[1]Brauer & Brauer, P.C., and Decnos Financial Group, Inc.

propriate multiple damages, as well as attorney's fees and costs, to be awarded under G. L. c. 93A. [420-422]

CIVIL ACTION commenced in the Superior Court Department on December 23, 1996.

The case was heard by *James F. McHugh, III, J.*

*Jeffrey D. Ganz* for the defendants.

*Michael J. Michaeles* for the plaintiff.

BERRY, J. The plaintiff, Grand Pacific Finance Corporation (GPFC), brought this action in three counts for conversion, fraud, and violations of G. L. c. 93A, § 11. GPFC sought to recover $100,000 that had been misappropriated. The $100,000 was part of a commercial loan of $750,000 from GPFC to Commonwealth Snack, Inc. (CSI), a corporate client of the defendant Brauer & Brauer, P.C. (the law firm).[2] At the time of the misappropriation, the money was temporarily being held by the defendant David P. Brauer, Jr. (Brauer Jr.), in an escrow account at the law firm. The $100,000 misappropriated from the escrow account was used to pay legal fees owed the law firm and consulting fees owed the third defendant, Decnos Financial Group, Inc. (Decnos), a company that had been set up by David P. Brauer, Sr. (Brauer Sr.).[3]

I. *Procedural and factual background.* Following a jury-

---

[2]In 1987, David P. Brauer, Jr. (Brauer Jr.), started the law firm of Brauer & Brauer, P.C., with his father, David P. Brauer, Sr. (Brauer Sr.). At all times relevant to the transactions in question, the two Brauers were the sole shareholders of the law firm. Brauer Jr., but not Brauer Sr., was named as a defendant in his individual capacity. At some point in 1996, Brauer Sr. had stopped practicing law. In 1998, following disciplinary proceedings by the Board of Bar Overseers in an unrelated matter involving unethical practices in a loan transaction between Brauer Sr. and a client, Brauer Sr. filed an affidavit of resignation as a disciplinary sanction. See *Matter of Brauer*, 14 Mass. Atty. Discipline Rep. 93 (1998). The brief filed on behalf of the appellants omits this information and misleadingly states that Brauer Sr. "resigned his bar membership, for reasons related to his physical health and unrelated to this matter." By material omission that is a misrepresentative statement.

[3]Brauer Sr. had invested $50,000 in the start-up of Decnos and was the sole shareholder, officer, and director of Decnos, a corporation that purported to provide investment and consulting services. Brauer Sr. conducted the business of Decnos from within the offices of the law firm, which was also the mailing address for Decnos.

waived trial, a Superior Court judge found both the law firm and Brauer Jr. individually liable for conversion, but dismissed the conversion claim against Decnos. The judge also dismissed the fraud claims against the three defendants on the basis that there was no proof that the defendants had made fraudulent representations at the time of the money transfer from GPFC to the law firm, or that GPFC had detrimentally relied on any misrepresentations in advancing the funds. The judge dismissed the G. L. c. 93A count on the basis that an escrow gives rise to fiduciary obligations that may be likened to a trustee's administration of a trust, and that such fiduciary responsibilities do not constitute trade or commerce within G. L. c. 93A.

Brauer Jr. and the law firm appealed from the judgments of conversion entered against them. GPFC cross-appealed from the dismissal of the conversion claim against Decnos and from the dismissal of the fraud and c. 93A counts as to all three defendants. We affirm the conversion judgment against the law firm and Brauer Jr. individually, the dismissal of the conversion claim against Decnos, and the dismissal of the fraud claim against all three defendants. We reverse the dismissal of GPFC's claims against all defendants in the count brought pursuant to G. L. c. 93A, § 11.

We recount the facts from the judge's comprehensive findings, which are amply supported in the record. On June 28, 1996, GPFC and CSI entered into a commercial loan agreement for five million dollars and a depository agreement, under which loan funds advanced by GPFC were to be held in an account at the China Trust Bank of New York (China Trust Bank). Pursuant to terms in the agreements, GPFC would have an "exclusive interest" in the funds, which were to remain GPFC's "sole and exclusive property," and subject to release only upon GPFC's directions. It was further agreed that GPFC would not advance any funds under the loan agreement until resolution of a lawsuit brought by a former CSI shareholder, referred to as the Dewey litigation. Brauer Jr. represented CSI in the Dewey litigation and was aware of the restrictive terms of the loan and depository agreements. In late summer of 1996, Brauer Jr. reported that the Dewey litigation could be settled by payment of $750,000.

GPFC agreed to lend CSI the money to pay for the settlement, subject to the terms of the loan and depository agreements and an additional condition set forth in a letter agreement as follows. On August 21, 1996, Walter Quednau, CSI's chief executive officer, sent a letter to GPFC requesting that the $750,000 loan advance be transferred from the depository account at China Trust Bank to the law firm's client group account, from which, upon completion of the settlement, the funds would be wired to Dewey's designated account. On behalf of CSI, Quednau represented that "[a]ny variance from the $750,000 wired funds and the Dewey settlement will be returned wire transfer to [GPFC] within 24 hours to . . . China Trust Bank (New York)." Brauer Jr. received and read this letter. On August 22, 1996, GPFC sent CSI a return letter, confirming the terms of the loan request, and stating that the $750,000 would be sent from the depository account to "David Brauer, Esq., as escrowee for the settlement of the Dewey suit." GPFC asked for Quednau's signature on the bottom of the August 22, 1996, letter acknowledging and approving the transaction on behalf of CSI. Quednau signed his assent, returned the letter to GPFC, and sent a copy of the letter to Brauer Jr. The judge found that Brauer Jr. accepted the $750,000 in escrow, subject to the restrictive terms set forth in the loan and depository agreements and the further condition in the August 21 letter agreement that the money was to be returned to GPFC if not paid in settlement of the Dewey litigation.

The $750,000 was wired to the law firm account on August 22, 1996. For reasons not appearing in the record, the Dewey settlement began to unravel. On August 30, having learned of problems with the settlement, GPFC faxed a letter to Quednau and the law firm, requesting that the funds be returned to GPFC. Brauer Jr. faxed GPFC a reply the same day, indicating that the settlement was going forward but that completion of the "paperwork" would take another week. That was not accurate.

In fact, Brauer Jr. had other plans for what would happen to part of the $750,000 being held in escrow at the law firm account. CSI owed the law firm legal fees for outstanding bills and owed Decnos $77,000 for consulting work supposedly done by Brauer Sr. Both father and son were concerned about CSI's

financial wherewithal to pay these outstanding fees. The two conferred to plan how a part of the money being held in escrow could be used to satisfy CSI's debts to the law firm and Decnos. In a delaying move, Brauer Jr. took the position that he would not return the funds to the China Trust Bank account until he received written instructions to do so from CSI's Quednau. This was so, the trial judge found, even though there was no doubt in Brauer Jr.'s mind that GPFC's request for the return of the funds was "consistent with the terms under which the funds had been wired into the Brauer & Brauer account." CSI's Quednau was aware of Brauer Jr.'s self-interest in having the law firm bills paid because, on August 30, the Friday before Labor Day, Brauer Jr. conveyed to Quednau his concerns about the law firm bill. In order to get the money back to GPFC on the next business day after this meeting, September 3, 1996 (the Labor Day holiday intervening), Quednau faxed the law firm instructions to immediately wire the full $750,000 to GPFC. Again Brauer Jr. did not comply, and the funds were held over in the law firm account. These delaying tactics by Brauer Jr. allowed Brauer Sr. time to retain Thomas Giblin, an attorney who rented space within the law firm, to file a collection action against CSI on behalf of Decnos.[4]

On September 4, while the law firm was still holding the funds, Giblin filed in District Court the Decnos collection complaint and an ex parte motion for trustee process. The District Court did not act on the trustee process motion that day, and so, the next day, September 5, Giblin filed a motion for a temporary restraining order (TRO) to enjoin the law firm from disbursing $77,000. Brauer Sr. filed an affidavit in support of the TRO that was misleading and false. Among other deceptive omissions, the affidavit did not disclose the GPFC rights over the subject funds, or that the law firm held the money in escrow. Based on the representations in the pleadings, on September 5, the District Court entered an order that $77,000 was to be held until further order of the court. Once the court order had issued,

---

[4]The trial judge found that Brauer Jr. deliberately "did not issue instructions [to return the money] because he was aware of the Decnos action and wanted to give Giblin an opportunity to obtain a court order effectively attaching the money Decnos claimed it was owed."

Brauer Jr. wired $650,000 to China Trust Bank, retaining $100,000. The $23,000 holdover beyond the amount specified in the court order was to cover the legal fees that CSI owed the law firm.[5]

To this point, Brauer Jr. had not responded to any of GPFC's communications demanding the return of its money, including the letter and fax mentioned above, and a series of telephone calls from GPFC's representatives. It was only on September 6, the day after the withholding of the $100,000 was a fait accompli, that Brauer Jr. wrote to GPFC, stating that, pursuant to a court order, he had placed $77,000 in an escrow account and that he had also placed $23,000 in a separate account for legal fees CSI owed his law firm.

Thereafter, on September 17, 1996, CSI filed for bankruptcy. The existence of the bankruptcy filing was not disclosed to the District Court. Notwithstanding the automatic stay that flows from a bankruptcy filing, see 11 U.S.C. § 362 (1993), on September 27, Decnos filed for, and obtained, a default judgment against CSI. Execution issued on November 27, 1996. Upon receipt of the execution from his father on the same day, Brauer Jr. transferred the $77,000 to Decnos.

II. *Analysis.*

A. *The appeal by the Brauer defendants.*

1. *Conversion by the Brauer defendants.* The elements of conversion require that a defendant be proved to have "intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal property to which he has no right of possession at the time . . . ." *Abington Natl. Bank* v. *Ashwood Homes, Inc.,* 19 Mass. App. Ct. 503, 507 (1985). Brauer Jr. and the law firm argue on appeal that conversion was not proved against them because GPFC lost its security interest in the $750,000 when the money left China Trust Bank and that, when deposited into the law firm account, the funds became CSI's property, subject to the claims of creditors, including that of the law firm and Decnos.

---

[5]The claim of legal fees in the amount of $23,000 is itself questionable on two accounts. First, the legal bills add up to only $19,628.90; and, second, of that amount, a "consultants fee" to Decnos for $15,000 is incorporated as part of the legal fees.

This argument is wholly at odds with the restrictive provisions in the loan and depository agreements, as well as the judge's express findings that the funds were deposited with the law firm solely subject to these terms. Neither Brauer Jr. nor the law firm can find excuse for their actions in the sophistry that the escrow had no effect. Their conversion was an act of "self-dealing by an escrow holder, [and such] an escrow holder's unauthorized collection from escrowed funds of a debt owed by a party to the escrow agreement, would be a breach of duty." *Discipline of Two Attorneys*, 421 Mass. 619, 627 (1996).

As to Brauer Sr.'s aiding and abetting the conversion to the benefit of his fifty percent interest in the law firm, the judge found that "by presenting misleading and inaccurate information to the District Court regarding the origin and claims to the [funds] Brauer & Brauer was holding, Brauer & Brauer, through Brauer Sr., converted $77,000 that belonged to GPFC." There is no question that, as to the conversion, "if, as was the case here, an escrow holder without disclosure sets in motion a process to deny a party to the escrow agreement a portion of the funds to be held in escrow and to transfer those funds to a client of the escrow holder, the escrow holder violates a fiduciary duty to that party to the escrow agreement." *Discipline of Two Attorneys, supra.*

The defendants also assert they cannot be found liable for conversion because the action of Brauer Jr. in withdrawing $77,000 from the escrowed account was pursuant to a default judgment and execution issued by the District Court. This order-of-the-court defense borders on the absurd, as shown by the Superior Court judge's finding that "misleading and inaccurate information [was presented] to the District Court regarding the origin and claims to the [funds] Brauer & Brauer was holding." The District Court order entered on the false foundation of these underlying misrepresentations.

The determinations that there was a breach of the terms of the escrow agreement and conversion of funds belonging to GPFC, and that the law firm and Brauer Jr. individually were liable for the conversion, are correct as matter of law and supported by the evidence.

2. *Brauer Jr.'s personal liability.* Brauer Jr. argues that the status of the law firm as a professional corporation under G. L. c. 156A, § 6(*a*), insulates him from personal liability and that GPFC failed to introduce evidence that would warrant piercing the corporate veil. Contrary to this contention, G. L. c. 156A, § 6(*b*), excludes the rendering and receiving of professional services from the limits on liability provided by incorporation of a law firm. Seeking to take himself outside the § 6(*b*) exclusion, Brauer Jr. notes that GPFC was not his client. Even so, the judge expressly found that the law firm was serving as escrow agent to *both* GPFC and CSI, the latter being a client of the law firm. Establishing the escrow, therefore, still constituted rendering and receiving professional services within the scope of the § 6(*b*) exclusion. Even were this not the case, personal liability would still befall Brauer Jr. because a corporate officer cannot evade personal liability for a tort that he himself committed. See *Refrigeration Discount Corp.* v. *Catino,* 330 Mass. 230, 235 (1953); *Townsends, Inc.* v. *Beaupre,* 47 Mass. App. Ct. 747, 751-752 (1999).

B. *GPFC's cross appeal.*

1. *Decnos's liability.* The judge dismissed the conversion claim against Decnos. The elements of conversion, which require proof of a defendant's wrongful acts of ownership, control, or dominion over property to which he has no right of possession, had not been established. See *Abington Natl. Bank* v. *Ashwood Homes, Inc.,* 19 Mass. App. Ct. at 507. GPFC challenges the dismissal, arguing that Brauer Sr. was acting as a collecting agent for Decnos when the former misled the District Court into granting an order reaching the escrow funds, and that under agency principles, Decnos should be held to answer for Brauer Sr.'s misconduct. The judge's reasoning is based on a distinction between Brauer Sr.'s role in furthering the conversion of money being held by the law firm and that of instituting a law suit on behalf of Decnos. To the extent Brauer Sr. acted on Decnos's behalf in filing suit to recover on a debt, his actions, while quite problematic for other reasons, did not constitute the tort of conversion.

Thus, while the elements of conversion were met as to the defendant law firm and Brauer Jr., who were holding the funds and wrongfully exercised dominion over them by the misap-

propriation, we agree with the trial judge that the elements of conversion were not established as to Decnos. Even if we apply principles of agency and attribute Brauer Sr.'s misdeeds to Decnos, it was not conversion for Decnos to commence litigation to collect the debt from CSI, since Decnos, unlike the law firm, had no obligation to honor the escrow and was free to commence litigation. Similarly, when the litigation was undertaken, even though Brauer Sr.'s "disclosures to the . . . District Court were not fair and candid," the misrepresentations by Brauer Sr. acting as Decnos's agent still did not establish the elements of conversion.

2. *Dismissal of the fraud count.* The judge dismissed the common-law fraud count because there was no evidence that the defendants had made fraudulent representations at the time that GPFC initially advanced the $750,000, or that GPFC had detrimentally relied on any misrepresentations in advancing the funds. The record supports that finding and dismissal. From all that appears, the fraudulent scheme and practices were hatched and effectuated after the original advance of the money by GPFC, following the unraveling of the Dewey settlement and GPFC's demand for return of its money. Accordingly, the dismissal of the fraud claims is affirmed.

3. *The G. L. c. 93A claim against Brauer Jr. and the law firm.* GPFC appeals the judge's determination that Brauer Jr. and the law firm were not subject to G. L. c. 93A. In dismissing this count, the judge considered that establishment of an escrow gives rise to certain fiduciary responsibilities on the part of the escrow holder.[6] The judge compared the escrow to a trust, and cited *Steele* v. *Kelley*, 46 Mass. App. Ct. 712, 726 (1999), for the proposition that "the actions of a trustee, executor, or administrator in executing fiduciary responsibilities do not constitute trade or commerce or involve the requisite com-

---

[6]"An escrow is created when one party to a transaction delivers a sum to a third party, the escrow agent, for him or her to hold until the performance of a condition and then to deliver to the other party to the transaction." *Frontier Enterprises, Inc.* v. *Anchor Co. of Marblehead*, 404 Mass. 506, 510 (1989). The holder of escrowed funds has fiduciary obligations to hold the funds pursuant to the terms of the escrow. See *Kaarela* v. *Birkhead*, 33 Mass. App. Ct. 410, 412 (1992), citing Restatement (Second) of Agency § 14D app., reporter's note at 60 (1958).

mercial marketplace transactions to bring them within c. 93A." However, this exclusive reliance on principles of trust and estate fiduciary law, in our opinion, is too limited a framework within which to view the attributes of this escrow and the business activities associated with it. Brauer Jr. and the law firm were not serving as trustees in the classic form of trust or estate administration, nor does this case (as did *Steele*) involve claims inter se by a trust or estate beneficiary against a trustee or administrator. Indeed, it was on principles of trust law, not present in this case, that the court in *Steele* excluded the G. L. c. 93A claims: "[t]he entirety of Steele's allegations constituted disputes between a beneficiary and the trustee over administration of a trust," and such trust administration matters are "internal disputes that are intra-enterprise, i.e., between parties in the same venture, [and] do not fall within the scope of c. 93A, § 11 . . . ." *Steele* v. *Kelley, supra.*

The nature of the claims in this case is markedly different from the pure trust law dispute presented in *Steele*, and also different are the legal personae of the individuals and entities involved. The controversy in this litigation does not involve inter se trust rights, but rather involves a quintessentially commercial transaction of a corporate loan to an ongoing business and an extra-enterprise business-to-business escrow arrangement among distinct corporate entities, including the separate corporations of GPFC, CSI, and Brauer & Brauer, P.C.[7] So viewed, the business law perspective within which this litigation is to be analyzed is broader than the traditional fiduciary trust law analysis that the judge applied in dismissing the G. L.

---

[7]Given the multiple corporate entities and businesspeople involved in the extra-enterprise dealings here presented, the case is also distinguishable from that line of cases holding G. L. c. 93A inapplicable to disputes involving a single entity, such as a partnership or closed corporation. See, e.g., *Zimmerman* v. *Bogoff,* 402 Mass. 650, 651, 662-663 (1988) (two shareholders in close corporation); *Szalla* v. *Locke,* 421 Mass. 448, 451-452 (1995) (partnership); *Newton* v. *Moffie,* 13 Mass. App. Ct. 462, 466-468 (1982) (partners in management of trust property). Absent in that line of cases, but present in this case, is the distinguishing mark for G. L. c. 93A applicability, i.e., interactive business transactions but with independent business entities. "The development of the statute . . . suggests that the unfair or deceptive acts or practices prohibited are those that may arise in dealings between discrete, independent business entities, and not those that may occur within a single company." *Manning* v. *Zuckerman,* 388 Mass. 8, 12 (1983).

c. 93A claim. The business undertakings at issue in this case, we believe, warrant scrutiny along the G. L. c. 93A line of analysis set out in *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 22-23, cert. denied, 522 U.S. 1015 (1997), quoting from *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995):

> "The applicability of G. L. c. 93A, §§ 2(*a*) and 11, to interactions between two parties requires a dual inquiry: first, the court assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.' '[Chapter 93A, § 11,] requires that there be a commercial transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce. Once it has been established that a commercial transaction exists, then [the court] address[es] whether the individuals were acting in a 'business context' and appl[ies] the test discussed in *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 (1980).' "

Given that the subject transactions in this case were commercial undertakings involving a corporation engaged in granting loans, a business engaged in commercial sales, a national bank, a consulting business, and a law firm providing professional and business-related services, the "commercial interaction" prong of the two-pronged *Linkage Corp.* standard was met.

We turn, then, to the second prong, whether the defendant participants were acting in a "business context." On this point, as *Linkage Corp.* directs, to determine whether the law firm and its shareholder, Brauer Jr., were acting in a business context, we apply the *Begelfer* test, which requires assessing "[1] the nature of the transaction, [2] the character of the parties involved, and the activities engaged in by the parties . . . . Other relevant factors are [3] whether similar transactions have been undertaken in the past, [4] whether the transaction is motivated by business or personal reasons . . . , and [5] whether the participant played an active part in the transaction." *Begelfer* v. *Najarian*, 381 Mass. at 191 (citation omitted). The record in this case meets four of the five *Begelfer* factors, and the sole exception —

whether similar transactions had occurred in the past — is not of material consequence. The nature of the transactions was commercial, the character of the parties involved corporate entities and individuals engaged in trade or business, the transactions on all sides were motivated by business reasons, and the participant defendants played an active role in the subject transactions.

That certain fiduciary obligations generally attend the establishment of an escrow (as do contract obligations, see note 6, *supra*) does not automatically transform an escrow — such as this escrow, which was established as a temporary depository within an entirely commercial business exchange — into a private trust beyond the reach of G. L. c. 93A. On this point, the analytic distinctions set forth in *Linkage Corp.*, which consider the "characteristics of activities engaged in," *Linkage Corp.*, 425 Mass. at 24, to determine whether fiduciary elements or business elements predominate in a particular transaction, are instructive.[8] "[W]hen, as is the case here, an institution's business motivations, in combination with the nature of the transaction and the activities of the parties, establish a 'business context' as contemplated in *Begelfer*, G. L. c. 93A will apply because the institution has inserted itself into the marketplace in a way that makes it only proper that it be subject to rules of ethical behavior and fair play." *Linkage Corp.*, 425 Mass. at 26-27. A similar analysis applies to this case. In accepting the GPFC loan advance in escrow subject to the terms of the agreements, the defendant participants inserted themselves in the midst of a commercial transaction in furtherance of their own business interests, and therefore, we conclude, G. L. c. 93A applies to their conduct. *Linkage Corp.*, 425 Mass. at 26-27.

Under G. L. c. 93A, a practice is unfair if it is "within . . .

---

[8]In *Linkage Corp.*, although the defendant university asserted that the subject transactions were undertakings within the scope of the university's status as a fiduciary nonprofit educational organization, the court held that the characteristics of the undertakings — which involved contracts by which the plaintiff in that case was to provide educational training and programs — were predominantly commercial transactions in which the university was acting in the marketplace in furtherance of its business interests. *Linkage Corp.*, 425 Mass. at 24-27. Given this predominance of commercial characteristics, the university's general educational mission did not insulate it from G. L. c. 93A liability. *Ibid.*

the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous; [and] . . . causes substantial injury to [other businessmen]." *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975), quoting from 29 Fed. Reg. 8325, 8355 (1964). The acts of Brauer Jr. and the law firm were deceptive practices within this standard and they are liable for damages under G. L. c. 93A.

4. *The G. L. c. 93A claim against Decnos.* We are of the opinion that the findings of the Superior Court judge also establish that Brauer Sr. engaged in fraudulent and deceptive practices in connection with, and in furtherance of, commencement of the Decnos collection action. In Brauer Sr.'s plans, the timing of the commencement of the Decnos lawsuit was critical in order to obtain an attachment while the monies were still being held at the law firm in Massachusetts, rather than returned to GPFC. That synchronized timing was achieved as a result of collusion between Brauer Sr. and Brauer Jr. in a deceptive scheme to dishonor the terms of the escrow and GPFC's demand for the return of the monies and to hold the $750,000 hostage for a few extra days, during which the Decnos collection action could be filed. This scheme by Brauer Sr. and Brauer Jr., as the two members of the law firm, utilized delaying tactics that were fraught with deceit, conflicts of interest, breach of ethical rules of confidentiality of privileged information, and the wrongful holding back of monies belonging to GPFC.

Because Brauer Sr. was an active participant in this fraud and collusion, under the doctrine of respondeat superior, Decnos is responsible for Brauer Sr.'s acts under G. L. c. 93A. A corporation is a creature of the law, a "separate and distinct legal entity [that] can only act through its agents." *Sunrise Properties, Inc.* v. *Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66 (1997) (citations omitted). Accordingly, the liability of the corporation is "necessarily vicarious." *Commonwealth* v. *L.A.L. Corp.*, 400 Mass. 737, 743 (1987), quoting from *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 263-264 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972). The imposition of such vicari-

ous liability is based on the concept that a corporation may "be held both civilly and criminally responsible (including as an aider and abettor) for actionable wrongs committed by its responsible officers." *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 494 (2000). Such corporate responsibility includes liability for unfair and deceptive trade practices committed in violation of G. L. c. 93A, § 11. "A corporation may be held vicariously liable under G. L. c. 93A for the conduct of an agent within the scope of employment 'if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer.' " *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 96 (1999), quoting from *Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 859 (1986). The deceptive acts and practices of Brauer Sr. in this scheme are attributable to Decnos and support the imposition of liability against Decnos under G. L. c. 93A.[9] *Sarvis* v. *Boston Safe Deposit & Trust Co.*, *supra.*

5. *The issue of G. L. c. 93A damages.* Having determined that all three defendants violated G. L. c. 93A, we confront the question whether a remand is necessary in order for damages to be awarded under that act and conclude that further proceedings on this point are not required in Superior Court. A remand is not necessary to quantify the damages under G. L. c. 93A, because the amount of $100,000 misappropriated from the

---

[9]The dismissal of the common-law claims of fraud as to all defendants and the common-law conversion claim as to Decnos is not inconsistent with the imposition of liability under G. L. c. 93A. Rather, the differences in result are attributable to different elements of proof and to the more expansive reach of G. L. c. 93A. This act, which sounds in terms of fraudulent and deceptive trade practice, is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights. The relief available under c. 93A is sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action. It mak[es] conduct unlawful which was not unlawful under the common law or any prior statute. Thus, a cause of action under c. 93A is not dependent on traditional tort or contract law concepts for its definition. [A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims." *Kattar* v. *Demoulas*, 433 Mass. 1, 12-13 (2000) (citations and internal quotations omitted).

escrow is a sum certain to both the defendants Brauer Jr. and the law firm, and the $77,000 transferred to Decnos is also a sum certain. A remand is also not necessary for the development of supplemental facts because, for the reasons addressed in parts 3 and 4, *supra*, and based upon the judge's extensive findings, it has been "established as a matter of both fact and law that [the defendants'] actions were unfair or deceptive." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 476 (1991).

Because of his conclusion that G. L. c. 93A was inapplicable, the trial judge did not, of course, enter findings concerning whether there was a knowing or wilful violation of the act. However, "[a] judge need not make an *express* finding that a person wilfully or knowingly violated G. L. c. 93A, § 2, as long as the evidence warrants a finding of either" (emphasis in original). *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 578 n.13 (1986). "Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, 'willful' behavior under the statute." *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 780 (1986). We conclude that, as in *Anthony's Pier Four*, the deceptive acts and practices of the defendants in this case "establishe[d] wilfulness as a matter of law" and, thereby, established a "knowing and wilful violation of G. L. c. 93A, § 2, as a matter of law." *Anthony's Pier Four, Inc.*, 411 Mass. at 475, citing *Pepsi-Cola Metropolitan Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985). Given the defendants' knowing and wilful violations of G. L. c. 93A, § 2, GPFC is entitled to multiple damages of not less than double nor more than treble its damages under G. L. c. 93A, § 11.

III. *Conclusion.* We reverse the judgment dismissing the claim under G. L. c. 93A, § 11. Judgment is to enter under G. L. c. 93A, § 11, in favor of GPFC in the total amount of $100,000, to be levied jointly and severally against defendants Brauer & Brauer, P.C., and Brauer Jr. individually, and against Decnos to the extent of $77,000. The judgment under G. L. c. 93A is with interest.

The judgment against Brauer & Brauer, P.C., and Brauer Jr.

on the conversion claim is affirmed.[10] We also affirm the judgment dismissing the conversion claim against Decnos, and the dismissal of the fraud claim against all the defendants.

The case is remanded to the Superior Court solely to determine whether, based on the trial judge's findings and the legal analysis set forth in this opinion, the conduct of the defendants was such that the multiplier for the damages should exceed the doubling of damages, provided as matter of law under G. L. c. 93A, § 11, and to determine whether any additional enhancement of damages is warranted up to the threefold measure set forth in § 11, which allows for a maximum of treble damages. Under G. L. c. 93A, GPFC is also entitled to reasonable attorney's fees and costs. A motion for such fees and costs is to be filed, and the amount of reasonable attorney's fees is to be determined, in the Superior Court. The existing injunction prohibiting Decnos from releasing $77,000, which the trial judge ordered was to be held in escrow, is to remain in effect subject to reconsideration by the Superior Court.

GPFC's motion for appellate attorney's fees and expenses is granted. The amount is to be determined in accordance with *Yorke Management* v. *Castro*, 406 Mass. 17, 20 (1989).

*So ordered.*

---

[10]We note that although there are judgments in the amount of $100,000 on both the conversion count and the G. L. c. 93A count, GPFC cannot "recover duplicative or cumulative damages under multiple legal theories based on the same core of fact." *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. 610, 625 (1994).