DECISION
Before the Court for decision is plaintiff The Cadillac Lounge, LLC's ("The Cadillac Lounge") action against defendant Sean M. McAteer, Esq. ("McAteer"), seeking $20,000 for alleged breach of contract, breach of a fiduciary duty, and conversion. The Court's jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 Facts and Travel
At the heart of this case is a dispute over the legal classification of a certain sum of money transferred from The Cadillac Lounge to McAteer for the purchase of a liquor license held by his client, La Petite France, Inc., a/k/a La Petite France En Villa, Inc. ("La Petite France"). The Cadillac Lounge argues that the $20,000 was transferred to McAteer to be held in escrow until the successful transfer of the liquor license. McAteer counters that the purchase and sale agreement was not an escrow agreement, and that the money was to be available for immediate disbursement.
Three witnesses-Richard Shappy ("Shappy"), Valentino Lombardi, Esq. ("Lombardi"), and McAteer-testified at a two day trial that commenced on May 31, *Page 2 
2007. Additionally, by agreement, certain portions of the deposition testimony of E. David Gaudet ("Gaudet") were read into the record.
The background to this case remains undisputed. Both parties agree La Petite France and Shappy d/b/a The Cadillac Lounge[1] entered into an agreement ("the Agreement") for the purchase and sale of Le Petite France's Class BX liquor license ("the License") for $20,000.See Exhibit 2. This agreement was executed by Gaudet, as Vice-President of La Petite France, and Shappy on December 11, 1998. It contained the following provision:
 "2. The PURCHASER shall pay the Twenty-Thousand Dollars ($20,000) to the SELLER upon the signing of this agreement to be held in the client's trust account of the SELLER'S attorney, Sean M. McAteer, Esquire pending the completion, submission, hearing, and decision of and on the transfer application to the City of Providence Board of Licenses. Upon successful completion of the transfer hearing and a decision by the Board of Licenses (scheduled for January 6, 1998[2]), the PURCHASER shall receive the BX license and the SELLER shall receive the monies being held by the SELLER's attorney." Id.
On December 11, 1998, Shappy's counsel, Lombardi, personally delivered to McAteer a check in the amount of $20,000 made payable to Sean McAteer, Esq. Lombardi also delivered to McAteer a letter dated December 11, 1998, which read:
"Dear Mr. McAteer:
 I have been authorized by my client, The Cadillac Lounge, L.L.C., to turn over to you to be placed in your client's trust account a check in the amount of $20,000 to be maintained *Page 3 
as escrow pending the successful liquor license transfer between our respective clients. The Purchase and Sales Agreement executed by our respective clients memorializes their agreement. It is also understood that if for any reason the transfer is not approved by the City of Providence Board of Licenses or on appeal there from the escrow funds shall be returned to my client.
 Please sign a copy of this letter acknowledging its receipt and also receipt of the escrow funds. . . ." See Exhibit 3.
The letter is signed by Lombardi, below which appears the signature of McAteer. Id.
On December 11, 1998, McAteer took possession of the money and deposited it into his clients' trust account. That same day, he also issued an $8000 check (Check No. 1692) made payable to David Gaudet out of his clients' trust account. He testified that he could not remember exactly when he saw a copy of the executed Agreement, but that it was after he signed the letter. On January 5, 1999, he issued and then endorsed a check (Check No. 1711) in the amount of $860, with the note "Gaudet Fee" written on the subject line. The next day, on January 6, 1999, McAteer issued several checks from his clients' trust account: Check No. 1712 in the amount of $1,500 to cash; Check No. 1715 in the amount of $40 made payable to the City of Providence; Check No. 1716 in the amount of $9255 made payable to June Gaudet; and Check No. 1717 in the amount of $50 made payable to cash.
A hearing before the Providence Board of Licenses was held on January 6, 1999, at which the transfer of the License from La Petite France to Shappy was approved by a vote of 5-0. On January 14, 1999, an appeal of the approval of the transfer was filed with the Liquor Control Administrator by a third-party objector. See Exhibit 10. The appeal was remanded to the Board of Licenses ("Board") because of an inaccurately drawn radius map. See Exhibit 12. Thereafter, a new application for transfer was filed with the *Page 4 
Board, and a hearing on the second application for the license transfer was heard on July 14, 1999. After this hearing, the Board rejected the transfer application by a 5-0 vote, and this decision was upheld by the Department of Business Regulation. See Exhibit 14, 15. Thus, the License was never transferred from La Petite France to The Cadillac Lounge.
On January 5, 2001, The Cadillac Lounge, through its attorney, sent a letter to McAteer seeking return of the escrow funds. See Exhibit 16. When McAteer did not return the money, The Cadillac Lounge filed the instant action.
 Standard of Review
In all actions tried upon the facts without a jury, the trial justice "sits as trier of fact as well as law," weighing and considering the evidence, determining the credibility of witnesses, and drawing inferences from the evidence presented. Hood v. Kawkins, 478 A.2d 181,184 (R.I. 1984). "The task of determining credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." State v. Sparks, 667 A.2d 1250, 1251 (R.I. 1995) (citingWalton v. Baird, 433 A.2d 963, 964 (R.I. 1981)). "It is also the province of the trial justice as a part of the fact-finding process to draw inferences from the testimony of witnesses, and such inferences, if reasonable, are entitled on review to the same weight as his [or her] other factual determinations." Walton, 433 A.2d at 964; see also RhodeIsland Hospital Trust National Bank v. Israel, 119 R.I. 298, 306,377 A.2d 341, 345 (1977). The trial justice need not engage in extensive analysis when making his or her findings of fact; "even brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983). *Page 5 
 Analysis
The Cadillac Lounge's suit against McAteer presents three alternative legal claims: breach of fiduciary duty, breach of contract, and conversion. In order to prevail on the claim of breach of fiduciary duty, the Plaintiff must prove 1) the existence of a fiduciary duty; 2) a breach of that duty; and 3) damages proximately caused by that breach.Griffin v. Fowler, 260 Ga.App. 443, 445 (Ga.App. 2003); Lyons v. MidwestGlazing, 265 F. Supp.2d 1061, 1076 (N.D. Iowa 2003); see also
37 Am.Jur. 2d Fraud and Deceit § 31. The Cadillac Lounge alleges that a fiduciary relationship existed between McAteer and itself because McAteer acted as an escrow agent in this transaction. McAteer denies that any such relationship existed. Because he represented Gaudet, McAteer contends that the only fiduciary relationship he had was to that client, not to The Cadillac Lounge.
The term "`fiduciary' is a broad concept, generally meaning `anyone in whom another rightfully reposes trust and confidence.'" A. Teixeira Co. v. Teixeira, 699 A.2d 1383, 1387 (R.I. 1997) (citing Francis X. Conway, The New York Fiduciary Concept in Incorporated Partnerships andJoint Ventures, 30 Fordham L. Rev. 297, 312 (1961)). An escrow agent has a fiduciary duty to hold the funds pursuant to the terms of the escrow agreement; he is not an agent to either party, but a fiduciary to both of them. Kaarela v. Birkhead, 33 Mass. App. Ct. 410, 412, 600 N.E.2d 608
(citing Restatement (Second) of Agency § 14D app., reporters note at 60 (1958)). The relevant inquiry thus becomes McAteer's status as an escrow agent.
An escrow account is created when one party to a transaction delivers a sum to a third party, the escrow agent, to hold until a certain condition is met, at which point the *Page 6 
sum is delivered to the other party to the transaction. Grand Pac. Fin.Corp. v. Brauer, 57 Mass. App. Ct. 407, 416, n. 6, 783 N.E.2d 849, 859, n. 6 (Mass. 2003) (citing Frontier Enterprises, Inc. v. Anchor Co. ofMarblehead, 404 Mass. 506, 510, 536 N.E.2d 352 (1989)); see also Black's Law Dictionary 584 (8th ed. 2004) (defining escrow as ". . . 4. the general arrangement under which a legal document or property is delivered to a third person until the occurrence of a condition."). The intent of the parties controls whether a sum placed with the third person is an escrow or a completely executed instrument. 28 Am. Jur. 2dEscrow § 7. "When the language of the instrument is vague and indefinite, however, the court must inquire into the circumstances and conditions surrounding the execution of the agreement to ascertain the intention of the parties." Id. A formal contract is not needed to form an escrow agreement; courts have inferred such agreements from an exchange of letters. Mercurius Inv. Holding, Ltd. v. Aranha,247 F.3d 328, 331 (1st Cir. 2001) (applying Massachusetts law) (citing Kaarela v.Birkhead, 33 Mass. App. Ct. 410, 600 N.E.2d 608, 609-10 (Mass.App.Ct. 1992)). "Moreover, while cases often speak of funds in escrow as being held by a third party, one party's counsel may act as an escrow holder so long as the parties agree that in this capacity counsel is to serve not as `the agent of either of the parties,' but as `a fiduciary of both of them.'" Id.
Here, the Court finds the existence of an escrow agreement is supported by a preponderance of the relevant and credible evidence presented at trial. First, the language of the Agreement itself supports this conclusion. The parties concur that the Agreement is unambiguous, but each argues that different conclusions should be drawn from its language. The Cadillac Lounge, citing the second paragraph in its entirety, argues that it *Page 7 
is clear that the money was to be paid only after the successful transfer of the License. McAteer, however, claims that the language states that the seller was to receive the money upon the signing of the Agreement. He points to the line, "The PURCHASER shall pay the Twenty-Thousand Dollars ($20,000) to the SELLER upon the signing of this agreement to be held in the client's trust account of the SELLER'S attorney, Sean M. McAteer, Esquire[.]" This language, he argues, unambiguously states that the payment was to be made at the time the Agreement was executed, and that McAteer was merely acting as an agent of a disclosed principle in accepting the money to be put in his client's trust account.
McAteer's analysis of the language, however, ignores the rest of that sentence. The sentence, in full, reads: "The PURCHASER shall pay the Twenty-Thousand Dollars ($20,000) to the SELLER upon the signing of this agreement to be held in the client's trust account of the SELLER'S attorney, Sean M. McAteer, Esquire pending the completion, submission, hearing, and decision of and on the transfer application to the City of Providence Board of Licenses." The use of the word "pending" clearly indicates that the funds were not to be transferred to La Petite France at the time the Agreement was executed, but rather, that the transfer of the money was contingent upon the transfer of the License.See, Black's Law Dictionary 1169 (8th ed. 2004) (defining "pending" as "[t]hroughout the continuance of; during" or "[w]hile awaiting; until"). In the context of this Agreement, it is clear that the money was to be secured in the clients' trust account — and was therefore unavailable for disbursement — until the completion of the License transfer. The nature of the arrangement strongly supports this conclusion as well. The word "appeal" is not specifically mentioned in the Agreement; however, it is axiomatic *Page 8 
that the granting of the transfer application is not final until the appeal period has run, or the appeals process is completed and the license is actually transferred. It strains credulity to believe that the parties intended that The Cadillac Lounge should pay $20,000 even if it never received the License because the decision to transfer the License was overturned on appeal.
Additionally, the letter written by Lombardi and signed by McAteer supports the Court's finding that an escrow agreement was formed, with McAteer to act as the escrow agent. McAteer argues that the letter was an attempt by Lombardi to modify the Agreement. The trial testimony was that Gaudet would not change the Agreement. Lombardi, however, testified candidly and credibly that he was not trying to change the agreement by writing the letter and asking McAteer to sign it; rather, he was merely trying to memorialize the exact understanding contained in the Agreement. He further stated that the letter served to confirm discussions held with McAteer regarding the account, during which it was determined that the $20,000 would be held in escrow until the appeal period ran. Because the evidence establishes that an escrow agreement existed, was discussed, and was understood by both parties, Gaudet's unwillingness to change the language of the Agreement is of no consequence.
The Court finds that the letter does not, in fact, alter the Agreement. Instead, the letter serves to confirm the intent of the parties as indicated in the second paragraph of the Agreement itself. Although the Agreement does not contain the word escrow,[3] it is clear, for the reasons outlined above, that the intent to form an escrow agreement was *Page 9 
contained in the language and nature of the Agreement. The letter only serves to further satisfy the Court that it was the intent of the parties to hold the money in escrow until the License was actually transferred. The letter does not add anything to the Agreement; it does, however, use specific language to address the agreed-upon consequences should the License transfer fail to occur: "It is also understood that if for any reason the transfer is not approved by the City of Providence Board of Licenses or on appeal there from the escrow funds shall be returned to [The Cadillac Lounge]." The entirety of the letter confirms the Court's finding that the parties intended to form an escrow agreement in the Agreement itself.
Furthermore, it is important to note that this letter was not only written by Lombardi, but signed by McAteer. McAteer testified at trial that he signed the letter to "acknowledge receipt" but that he "understood [he] was not to hold it in accord with what [the letter] said." He contends that his understanding is supported by the language in the letter: "Please sign a copy of this letter acknowledging its receipt and also receipt of the escrow funds." However, on the evidence before it, the Court does not find persuasive McAteer's assertion that he signed the letter merely to acknowledge receipt yet did not bother to indicate clearly, either verbally or in writing, that he was contesting the contents. McAteer testified that he did not inform Lombardi that he would not serve as an escrow agent. He stated that, in fact, he did not "[exchange] four words with [Lombardi] that day." Lombardi confirmed this testimony, stating that McAteer never contacted him regarding the letter, and never indicated that the terms outlined in the letter mischaracterized the Agreement in any way. Finally, the Court is shocked by McAteer's candid admission that he did "not entirely" understand the contents of the December 11, *Page 10 
1998 letter, and that he has "learned more about escrow agreements since then." McAteer never communicated this confusion to Lombardi, and made no apparent attempt to clarify his understanding of escrow agreements prior to signing the letter. Therefore, the Court finds that McAteer's signature is evidence that he was accepting the letter as an affirmation of the parties' understanding, rather than merely acknowledging its receipt.
As stated above, McAteer testified that, based on his conversations and correspondence with Gaudet, he understood that the money was to be available immediately. Gaudet's deposition testimony on the matter, however, was somewhat disjointed and unclear on this point:
"Q: And that twenty thousand was put in an escrow account in the name of your attorney, Sean McAteer?
"A: I presume it was put in an escrow account to be held by that attorney.
". . .
"Q: So it was your intention that the money be held in his client account and not in his escrow account; is that correct?
"A: Well, I'm actually unsure of the specifics of that at this moment.
". . .
"Q: Now, Mr. Gaudet, as you sit here today, was part of that agreement that after the tender of the twenty thousand dollars and prior to the approval of the city for the transfer that you were able to access some of those funds; is that correct?
"A: Yes."
Gaudet's conflicting testimony on the specifics of the arrangement-whether the money was to be placed in an escrow account or not-diminishes his credibility on this important *Page 11 
issue. Gaudet's testimony evidenced further contradictions with respect to the disbursement of the funds. Gaudet adamantly denied that he had ever received any of the $20,000. However, he endorsed the $8000 check issued to him (Check No. 1962), and there is no evidence to suggest that the signature is not valid. See Exhibit 4. Because of these inconsistencies, the Court does not find credible Gaudet's testimony as to his intention at the time of the Agreement.
Thus, the Court finds that the evidence overwhelmingly indicates that the parties intended to form an escrow agreement to secure the $20,000 until the actual transfer of the License. The Court also finds that McAteer agreed to act as an escrow agent, therefore becoming a fiduciary to both parties. The next inquiry is whether McAteer breached these fiduciary duties. The Court finds that he did.
McAteer first disbursed money from the account on December 11, 1998. This disbursement occurred nearly a month before the transfer hearing was held when the License still remained the property of La Petite France. He then issued five checks on the same day as the hearing, but before the hearing actually occurred. Thus, all of these disbursements occurred before an actual transfer of the License and violated the escrow agreement. Because the transfer of the License was never completed, The Cadillac Lounge never received the License. Therefore, per the terms of the escrow agreement, The Cadillac Lounge is entitled to a return of the $20,000 placed in escrow. Shappy testified that those funds had never been returned, and thus, the Court finds that The Cadillac Lounge was entitled to a return of these funds.
Although the Court finds for The Cadillac Lounge on the breach of fiduciary duty claim, it will now briefly address the other two claims. The breach of contract claim is *Page 12 
based upon the theory of implied contract. The Cadillac Lounge alleges that the conduct of the parties, along with the Agreement, establishes a sufficient basis for the Court to determine that an implied-in-fact contract existed between The Cadillac Lounge and McAteer regarding the sale of the liquor license. An implied-in-fact contract is a type of contract "wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document."Marshall Contrs. v. Brown Univ., 692 A.2d 665, 669 (R.I. 1997) (citations omitted). The difference between an express contract and an implied-in-fact contract is simply the manner by which the parties express their mutual assent. Id. Therefore, in order for the Plaintiff to prove the existence of an implied contract, it must prove the same elements necessary to prove the existence of an express contract: mutual agreement, intent to promise, J. Koury Steel Erectors v. San VelConcrete, 120 R.I. 360, 387 A.2d 694, 697 (1978), and consideration.Hayes v. Plantations Steel, 438 A.2d 1091, 1094 (R.I. 1982). Once the existence of an implied contract is established, the Plaintiff must then prove that the Defendant breached the contract, and that the breach was a proximate cause of the Plaintiff's damages in order to satisfy all elements of the claim.
Here, The Cadillac Lounge alleges that the evidence shows the existence of an implied contract between McAteer and The Cadillac Lounge. However, the undisputed testimony before the Court is that McAteer was not involved in the formation of the Agreement, and, in fact, did not even see a copy of the executed Agreement until after he received the money from Lombardi. Thus, while the evidence may be sufficient to establish an implied contract between The Cadillac Lounge and Gaudet, the relationship *Page 13 
among the three parties-McAteer, The Cadillac Lounge, and Gaudet-is more properly classified as one formed by an escrow agreement, with McAteer acting as the escrow agent and fiduciary. Therefore, the Court declines to find that an implied contract existed between McAteer and The Cadillac Lounge because McAteer was neither a participant in the negotiations, nor a signatory to the Agreement.
The Plaintiff also asserts a claim against the Defendant for conversion. In order to prevail on this claim, the Plaintiff must prove that the Defendant "[took] the plaintiff's personalty without consent and exercise[d] dominion over it inconsistent with the [P]laintiff's right to possession." Fuscellaro v. Industrial Nat'l Corp.,117 R.I. 558, 560-561 (R.I. 1977) (citing Iavazzo v. R. I. Hosp. Trust Co.,51 R.I. 459, 462, 155 A. 407, 408 (1931)). "The focus of inquiry is `whether [a] defendant has appropriated to his [or her] own use the chattel of another without the latter's permission and without legal right.'" DeChristofaro v. Machala, 685 A.2d 258, 262 (R.I. 1996) (quoting Terrien v. Joseph, 73 R.I. 112, 115, 53 A.2d 93, 925 (1947)).
In order for a plaintiff to prevail on his claim of conversion, he must "demonstrate an ownership or possessory interest in the property at the time of the conversion." DeChristofaro v. Machala, 685 A.2d 258, 263
(R.I. 1996) (citing Larson, 24 R.I. at 318, 53 A. at 94 (1902); 18 Am.Jur. 2d Conversion § 2 at 146-47 (1985)). When an instrument or sum of money is in escrow, "no legal title or estate passes until the condition has been performed or the event has happened upon which it is to be delivered to the grantee and it has been delivered by the depositary to the grantee." 28 Am. Jur. 2d Escrow § 17 (citing Hastings v. Bank ofAmerica Nat'l Trust Sav. Asso., 79 Cal. App. 2d 627, 629
(Cal.Ct.App. 1947)). Furthermore, the Plaintiff "must identify *Page 14 
the allegedly converted property with reasonable certainty, in order to render it capable of identification, for the purpose of determining whether the property in fact belonged to the plaintiff at the time of its conversion." DeChristofaro v. Machala, 685 A.2d 258, 263 (R.I. 1996) (citing Larson v. Dawson, 24 R.I. 317, 318, 53 A. 93, 94 (1902)); 18 Am.Jur. 2d Conversion § 2 at 146-47 (1985). When money is specifically identifiable, it can form the basis of a conversion action.Id. (citing 7 Stuart M. Speiser et al., The American Law of Torts § 24:6 at 717-18 (1990)).
The Cadillac Lounge argues that the money in escrow was still its property at the time McAteer disbursed the funds. It contends that the Agreement prohibited McAteer from removing the funds until the License was successfully transferred, and thus, his disbursement of funds was without permission and amounted to conversion. McAteer counters that The Cadillac Lounge's claim must fail because it did not have possession of the money at the time McAteer disbursed it, and McAteer did not distribute the money for his own use. At the most, McAteer allows, The Cadillac Lounge can assert a claim of conversion in the amount of $860, the amount he disbursed to himself.
McAteer's argument that the money was no longer in The Cadillac Lounge's possession is unavailing. The Court has already determined that the agreement concerning the transfer of the $20,000 amounted to an escrow agreement. Because the conditions of the Agreement were not met, the legal title to the money in escrow did not pass from The Cadillac Lounge to McAteer. See, 28 Am. Jur.2d Escrow § 17 (2000). Therefore, The Cadillac Lounge still had legal ownership of the money at the time McAteer issued the checks. Further, the money was deposited in the client's trust account, to be held in escrow until the terms of the Agreement were fulfilled. Because *Page 15 
the money still legally belonged to The Cadillac Lounge and it was placed in a special trust account, it can be specifically identified. However, the Plaintiff has failed to prove that McAteer "demonstrate[d] an ownership or possessory interest in the property[.]" There is no evidence that McAteer attempted to exercise dominion over the money. Although he issued the checks from the account, he never attempted to pass the money as his own. Rather, his consistent testimony was that he was disbursing the checks at he behest of his client. Although Gaudet's testimony contradicted McAteer's contentions that he disbursed the money according to the wishes of his client, the Court has previously found Gaudet's testimony to be questionable. Therefore, the Court does not find that McAteer displayed the requisite possessory interest to be liable for a claim in conversion, and thus, The Cadillac Lounge's claim must fail.
The final issue before the Court is The Cadillac Lounge's claim for punitive damages, or in the alternative, for attorney's fees. The Cadillac Lounge argues that McAteer's testimony was incredible, and that his disbursement of the funds before the actual hearing on the License transfer was a willful violation of the escrow agreement amounting to fraud. To receive punitive damages, Rhode Island law requires the prevailing party to meet a rigorous standard. Cady v. IMC Mortg.Co., 862 A.2d 202, 219-220 (R.I. 2004) (citations omitted). "[A] party seeking an award of punitive damages bears the burden of producing `evidence of such willfulness, recklessness, or wickedness on the part of the party at fault, as amounts to criminality, which for the good of society and warning to the individual, ought to be punished.'"Soares v. Ann Hope, Inc., 637 A.2d 339, 351 (R.I. 1994) (citingPalmisano v. Toth, 624 A.2d 314, 318 (R.I. 1993) (citation and quotations omitted)). The Court finds that The Cadillac Lounge has *Page 16 
not met its burden here. The Cadillac Lounge largely bases its argument on its conversion claim, but the Court has found no evidence to suggest that McAteer attempted to possess dominion over The Cadillac Lounge's property, or to fraudulently convert it to his own use. The inconsistencies of McAteer's testimony have been taken into account by the Court in determining the intent of the parties in forming the Agreement. Although McAteer's conduct amounts to a breach of his fiduciary duty as escrow agent, the Court does not find that his actions amount to conversion or fraudulent behavior. Thus, the Court finds that an award of punitive damages would be inappropriate in this case.
Similarly, the Court declines to award attorney's fees in this case. The Cadillac Lounge has petitioned for attorney's fees under Section9-1-45. This statute allows the Court to "award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court: (1) Finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party; or (2) Renders a default judgment against the losing party."[4] Rhode Island applies this Section narrowly, granting attorney's fees only where the defeated party's claim is "completely meritless,"Billings Co., Inc. v. Pine Street Realty Assoc. Ltd. P'ship,754 F. Supp. 10, 14 (D. R.I. 1990), or "clearly frivolous." Greensleeves, Inc.v. Smiley, 754 A.2d 102, 103 (R.I. 2000). Although it is within the discretion of the Court to award attorney's fees pursuant to this standard, where the losing party has posited even "an arguable proposition of law," attorney's fees are generally denied. Bucci v.Anthony, *Page 17 667 A.2d 1254, 1256 (R.I. 1995). Viewing the case under this strict lens, the Court finds that The Cadillac Lounge has not met the burden required by the statute. The intent of the parties in forming the Agreement was a legitimately contested issue, and conflicting evidence was presented in support of both parties' arguments. Although the Court has found that a preponderance of the credible evidence showed that the parties intended to form an escrow agreement, this question presented a justiciable issue of fact for the Court, and thus, attorney's fees are not warranted pursuant to Section 9-1-45.
 Conclusion
Based on the foregoing findings and analysis of the evidence before it, the Court concludes that the parties formed an escrow agreement, with McAteer to act as the escrow agent. Because the conditions of the agreement were not met, McAteer prematurely disbursed the funds and violated his fiduciary duty as escrow agent, causing The Cadillac Lounge to suffer a loss of $20,000. Therefore, the Court finds in favor of The Cadillac Lounge on its breach of fiduciary duty claim in the amount of $20,000. All remaining claims of the Cadillac Lounge, including its claims for punitive damages and attorney's fees, are denied.
Counsel shall prepare an appropriate judgment for entry.
[1] McAteer argues that The Cadillac Lounge is not the proper party to bring this action. He argues that Shappy should have brought the action because he signed the Agreement individually. However, although Shappy signed the Agreement in his individual capacity, a review of the entire Agreement supports a finding that he executed the document on behalf of the corporation. In the first paragraph of the Agreement where the parties are identified, see Exhibit 2, the "Purchaser" is identified as Richard V. Shappy d/b/a The Cadillac Lounge, LLC.
[2] The parties agree that the correct date of the hearing was January 6, 1999, and the inclusion of the wrong date in the Agreement was merely a typographical error.
[3] McAteer argues that the word "escrow" had been present on previous drafts of the Agreement with other potential buyers and Gaudet purposefully removed it from this agreement with The Cadillac Lounge. However, the formation of an escrow agreement is a matter of intent, not semantics, and Gaudet's removal of the actual word does not change the fact that the Agreement clearly calls for the funds to be held in an account-one not under the control of Gaudet-pending the transfer of the License.
[4] This statute applies specifically to breach of contract claims. G.L. 1956 § 9-1-45. Although the Court has declined to find an implied contract in this case, the Court finds that the breach of the escrow agreement may function as a breach of contract. "An escrow agreement, while imposing a fiduciary relationship, and assuming some of the characteristics of a trust, is in essence a contractual undertaking to assure the carrying out of obligations already contracted for . . ." 28 Am. Jur. 2d Escrow § 1 (2000). Attorney's fees are denied in this case, but the Court has assumed, arguendo, that Section 9-1-45 may be applied where there has been a breach of an escrow agreement.